Jim CAMPBELL, et al., Plaintiffs,

v.

Susan BYSIEWICZ, in her official capacity as Secretary of State of Connecticut, Defendant.

No. CIV. 3:02CV488(PCD).

United States District Court, D. Connecticut.

July 23, 2002.

William M. Bloss, Jacobs, Grudberg, Belt & Dow, P.C., New Haven, CT, Elizabeth Daniel, Brennan Center For Justice, NYU School Of Law, New York City, for plaintiffs.

Gregory T. D'Auria, Attorney General's Office, Jane R. Rosenberg, Eliot D. Prescott, Attorney General's Office, Hartford, CT, for defendant.

## RULING ON PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION

DORSEY, Senior District Judge.

Plaintiffs move for a preliminary injunction. Their motion is granted in part and denied in part.

## I. STATUTORY BACKGROUND

Under current Connecticut election statutes, enacted in 1955, there are three kinds of office: state, district, and municipal. State office is an office for which all electors in the state may vote. Examples of state offices include the governor, attorney general, and U.S. Senator. District office is an office for which only electors from that given district may vote, a district being a voting region of more than one town.[1] Examples of district offices include all 36 state senate seats and 74 of the 151 state house seats. Municipal office is an office for which only electors from a single town may vote.[2] Examples of municipal offices include the other 77 state house seats and all local offices such as mayor.

To get on a political party's primary ballot for state or district offices, a candidate must either receive the political party endorsement or else obtain at least 15% of the delegate votes to that political party's state or district convention. A primary is then held if there is more than one candidate for a political party nomination for a given office.

To get on a political party's primary ballot for municipal offices, a candidate must either receive the political party endorsement or else obtain signatures of at least 5% of the political party's registered voters in that town. A primary is then held if there is more than one candidate for a political party nomination for a given office.

## II. PROCEDURAL BACKGROUND

Plaintiffs are seven individuals[3] and two corporations who seek to strike down three Connecticut election statutes, CONN. GEN. STAT. §§ 9–400, 9–410(c), 9–416, as unconstitutional. They sue under 42 U.S.C. § 1983, alleging that the statutes are unconstitutional under the First and Fourteenth Amendments, both facially and as applied. They also seek an injunction barring Defendant, the Connecticut Secretary of State, from enforcing these statutes and permitting their petitions for access to the primary ballot.[4]

## III. DISCUSSION

Plaintiffs challenge the system for getting on the primary ballot for state and

---

1. More precisely, a district is a voting region of the state "which crosses the boundary or boundaries between two or more towns." CONN. GEN. STAT. § 9–372(3).

2. More precisely, a municipal office is an "office for which only electors of a single town, city, borough, or political subdivision ... may vote." CONN. GEN. STAT. § 9–372(7). Whereas a municipal voting region may be equal to or smaller than a single town or city, it cannot be larger. If it were larger, it would be a district or state voting region. The term town is used above to simplify the discussion.

3. At the preliminary injunction hearing, two of the individual Plaintiffs declared that they would run for office but for the current statutory primary process. Mr. Jim Campbell declared his intent to run for the 4th Congressional seat to the Connecticut House of Representatives. Mr. Ed Gomes declared his intent to run for the 23rd Senate seat to the Connecticut Senate. A third Plaintiff, Ms. Pamela Byrnes, declared through counsel that she no longer intends to run for office this term.

4. Lastly, they also seek attorneys' fees under 42 U.S.C. § 1988.

district offices; they do not challenge the system for municipal office. They argue that the current district and state office primary ballot system (1) places an undue burden on candidates seeking access to the ballot for such office; (2) gives voters in multi-town districts less ability to participate in their political party's nomination process than voters in single-town districts; and (3) places an undue limitation on the number of people available to circulate signature petitions.

"It is ... black-letter law [in the Second Circuit] that the party seeking a preliminary injunction must establish that: (1) absent injunctive relief, it will suffer an irreparable harm; and (2) either (a) a likelihood of success on the merits or (b) sufficiently serious questions going to the merits to make them a fair ground for litigation and the balance of hardships tips in favor of the movant.".

*Hickerson v. City of N.Y.*, 146 F.3d 99, 103 (2d Cir.1998) (citation omitted). If, as here, "the moving party seeks a preliminary injunction that will affect government action taken in the public interest pursuant to a statutory or regulatory scheme, the injunction will be granted only if the moving party meets the more rigorous likelihood-of-success standard." *No Spray Coalition, Inc. v. City of N.Y.*, 252 F.3d 148, 150 (2d Cir.2001) (per curiam) (internal quotation marks omitted); *see, e.g., Rockefeller v. Powers*, 74 F.3d 1367, 1376–77 (2d Cir.1995) (applying this standard of preliminary relief in the context of candidate ballot access in a primary election) (equal protection claim). When such an injunction against the government "will alter rather than maintain the status quo, the movant must show ... [a] substantial like-

lihood of success." *No Spray Coalition,* 252 F.3d at 150 (internal quotation marks omitted). The analysis below first considers Plaintiffs' likelihood of success on the merits, then what relief to provide if Plaintiffs could show irreparable harm, and lastly considers whether the harm Plaintiffs would suffer would be irreparable.

**A. Plaintiffs' Likelihood of Success on the Merits**

*1. Constitutionality of the statutes controlling access to the state and district office primary ballot*

■ State statutes validly enacted are presumed constitutional. *See United States v. Carolene Prods. Co.*, 304 U.S. 144, 148, 58 S.Ct. 778, 82 L.Ed. 1234 (1938). "[G]overnmental policies implemented through legislation or regulations developed through presumptively reasoned democratic processes are entitled to a higher degree of deference and should not be enjoined lightly." *Able v. United States*, 44 F.3d 128, 131 (2d Cir.1995) (per curiam).

Plaintiffs allege violations of their First Amendment right of association[5] by placing an undue burden on candidates seeking access to the primary ballot and on voters seeking to vote for the candidate of their choice.[6] Plaintiffs' likelihood of success on the merits depends on whether the statutory process to challenge a party-endorsed candidate is reasonable. *Cf. Tansley v. Grasso*, 315 F.Supp. 513, 518 (D.Conn. 1970) (three-judge panel) ("so long as the standards adopted are reasonable") (equal protection claim). Regulations that impose "severe burdens on plaintiffs' rights must be narrowly tailored and advance a

---

**5.** Since these are state, not federal, statutes, more precisely, Plaintiffs allege a violation of the First Amendment right to association as incorporated through the Fourteenth Amendment.

**6.** Plaintiffs also allege a violation of their Fourteenth Amendment right to equal protection. In light of the disposition above, this claim need not be separately addressed at this time.

compelling state interest. Lesser burdens, however, trigger less exacting review, and a State's important regulatory interests will usually be enough to justify reasonable, nondiscriminatory . restrictions." *Timmons v. Twin Cities Area New Party,* 520 U.S. 351, 358, 117 S.Ct. 1364, 137 L.Ed.2d 589 (1997) (internal quotation marks omitted) (deciding whether a state election law violated First Amendment right of association). This court must "weigh the 'character and magnitude' of the burden the State's rule imposes on those rights against the interests the State contends justify that burden, and consider the extent to which the State's concerns make the burden necessary." *See id.* (citation omitted).

In determining whether the statutory process for challenging a party-endorsed candidate is reasonable, the inquiry is not merely whether the statutes impose some burden. The State has an important interest in creating a threshold to screen out candidates who do not enjoy a "significant modicum of support" among eligible voters. *See Jenness v. Fortson,* 403 U.S. 431, 442, 91 S.Ct. 1970, 29 L.Ed.2d 554 (1971); *see also Munro v. Socialist Workers Party,* 479 U.S. 189, 194, 107 S.Ct. 533, 93 L.Ed.2d 499 (1986) ("States have an undoubted right to require candidates to make a preliminary showing of substantial support in order to qualify for a place on the ballot ...." (internal quotation marks omitted)). A contrary rule could transform the primary ballot from a choice among a small number of candidates who enjoy a significant modicum of support into a potentially massive listing of candidates, replete with candidates who enjoy little or

no support. *See Anderson v. Celebrezze,* 460 U.S. 780, 788 n. 9, 103 S.Ct. 1564, 75 L.Ed.2d 547 (1983) ("it is both wasteful and confusing to encumber the ballot with the names of frivolous candidates") (First and Fourteenth Amendment claims); *see also Storer v. Brown,* 415 U.S. 724, 732, 94 S.Ct. 1274, 39 L.Ed.2d 714 (1974) ("the State understandably and properly seeks to prevent the clogging of its election machinery"). However, the State may not impose an overly burdensome system on candidates' access to the primary ballot. Plaintiffs' First Amendment rights to association are not accommodated if their access is unduly and unjustifiably restricted.

The record in this case consists of Plaintiffs' proffered affidavits, the testimony at the July 18, 2002 preliminary injunction hearing, and Plaintiffs' statistical evidence. In part Plaintiffs' affidavits show Connecticut's primary ballot access system is different from the other 49 states. This is not highly persuasive. Connecticut is free, within constitutional limitations, to choose any ballot access system for itself that it wishes, whether or not any other State has seen fit to adopt a similar system. Its ability to choose its own system is not dependent on the systems of any other State.

The testimony of Mr. Campbell and Mr. Gomes shows that it takes considerable effort to access the primary ballot for state and district offices. Standing alone, this evidence goes to show a burdensome primary ballot access system.[7]

The record, as a whole, suggests a primary ballot access system whereby even

---

7. Defendant argues that indeed the burden a candidate faces is directly connected to the ability of the candidate, through his or her own efforts, to garner the support of his or her own political party. While there is an element of truth to this, it oversimplifies the issue. Defendant's argument would justify almost any delegate-vote requirement, since but for a candidate's inability to garner more votes, he or she could have succeeded. This court's inquiry is into whether the primary ballot access is reasonable, not into whether it is insurmountable.

candidates who enjoy a significant modicum of support are confronted with a very substantial obstacle in obtaining the 15% of delegate votes necessary to appear on a primary ballot. The proffered affidavits describe a complex and multi-layered system needed to garner the requisite number of delegate votes. As a practical matter, the evidence demonstrated a casting of the die in the first stage of the delegate selection, whether by town committee or caucus. Thereafter, the one who is not initially supported by the delegates faces an uphill battle trying to change the delegation makeup, particularly with slate ballots, in which anything short of a majority vote by the party members results in no acquisition of delegate support. Taken with Mr. Campbell's and Mr. Gomes's testimony, this strongly suggests an overly burdensome primary ballot access system. It appears to create a threshold which is more difficult to surmount than is reasonably necessary to achieve the legitimate purpose of screening out candidates with no real support. The statistical evidence [8] of all primaries over the last 47 years, while not conclusive, lends significant support to a conclusion that the primary ballot access system is overly burdensome. When considering only incumbent-versus-challenger races, the statistical evidence is even more persuasive. That only one person has ever successfully navigated the primary ballot system [9] against an incumbent [10] running for U.S. House of Representatives, U.S. Senate, Connecticut governor, or Connecticut secretary of state in 47 years [11] lends substantial support for the proposition that a meaningful opportunity to get on a primary ballot is not afforded potential, interested candidates, even if some candidates with 15% of the delegate vote decided not to seek a primary

In opposition, Defendant offers no real analysis in support of the current system. Defendant points to *Tansley*, 315 F.Supp. 513, wherein an equal protection claim that had sought to strike down differing primary ballot access systems for multi-town districts and single-town districts was rejected. That case is distinguishable. It did not analyze the burden of the 15%-delegate-vote rule as is possible on the record here. This court reviews the current scheme under a First Amendment analysis, not an equal protection analysis as in *Tansley*. *Tansley* at best resolved the issue of whether Connecticut could have different systems for primary ballot access. Left unresolved by *Tansley* is whether the primary ballot access system challenged here was overly burdensome. *Tansley* upheld the then statutory primary ballot scheme based on its conclusion that "[t]he interests and objectives of party members in a single municipality are likely to be more uniform, than would be the case where multiple municipalities were involved." *Id.* at 517. *Tansley* cites no authority for this conclusion. It seems speculative to conclude that a large city with its many and varied constituents has a more uniform point of view than two small, neighboring, farm communities.

---

**8.** By stipulation of counsel at the evidentiary hearing, Defendant does not challenge the accuracy of Plaintiffs' statistical evidence.

**9.** Over its 47–year history, at times the election statutes have imposed an even higher burden than at present. Until 1993, candidates were required to win 20% of the delegate vote. Until 1979, candidates were required to file petitions in addition to winning 20% of the delegate vote.

**10.** The challenge was to Ella Grasso's 1978 reelection campaign for governor.

**11.** Contrast this to recent nationwide averages. For U.S. House of Representatives races nationwide, 19% of incumbents faced a primary challenge in 1998 (and 17% in 2000). For U.S. Senate races nationwide, 41% of incumbents faced a primary challenge in 1998 (and 34% in 2000).

In terms of access to the general election, Defendant suggests that Plaintiffs have available an independent party candidacy. Plaintiffs do not directly challenge ballot access to the general election; they challenge access to the political party primary ballot. Moreover, the suggestion of an independent candidacy is not a meaningful opportunity in contrast to a party candidacy.

While the State has an interest in limiting challengers who appear on the primary ballot to those who have significant modicum of support among eligible voters, a prospective candidate who enjoys such a significant modicum of support should have a reasonable opportunity to use it. "Restrictions on access to the ballot burden two distinct and fundamental rights, the right of individuals to associate for the advancement of political beliefs, and the right of qualified voters ... to cast their votes effectively." *Rockefeller*, 74 F.3d at 1377 (internal quotation marks omitted). Voters comprising a candidate's significant modicum of support should not be disenfranchised by an overly burdensome primary ballot process that bars their candidate from appearing on the primary ballot. Under the current system, in the absence of a challenger, no primary is held, denying voters the thin reed of writing in an alternate candidate of their choice. This system has systematically denied Connecticut voters over the last 47 years a direct primary for district and state offices to an extent that clearly suggests that the 15%-delegate-vote rule far exceeds a means to a legitimate end, the screening out of candidates who lack a significant modicum of support. Rather, the current system screens out candidates who could have sufficient party-member support but who are excluded from the chance of showing the full measure of their support and giving their supporters the chance to be heard.

Plaintiffs' sufficient and persuasive evidence of an overly burdensome system has satisfied their burden to show a substantial likelihood of success on the merits.

### 2. Constitutionality of the statute limiting petition circulators

▮ The Supreme Court has struck down as unconstitutional a state law requiring that a ballot access petition circulator be a registered voter. *Buckley v. Am. Constitutional Law Found.*, 525 U.S. 182, 119 S.Ct. 636, 142 L.Ed.2d 599 (1999). The Second Circuit about two years later struck down as unconstitutional a New York statute on who may circulate petitions for access to the ballot which required petition circulators be a "resident of the political subdivision in which the office or position is to be voted for," N.Y. Elec. L. § 6–132(2). *Lerman v. Bd. of Elections*, 232 F.3d 135, 145–48 (2d Cir.2000), *cert. denied sub nom. N.Y. State Bd. of Elections v. Lerman*, 533 U.S. 915, 121 S.Ct. 2520, 150 L.Ed.2d 692 (2001). The Connecticut statute at issue, requiring that petition circulators be "entitled to vote in the primary for which candidacy is being filed," CONN. GEN. STAT. § 9–410(c), is very similar. Defendant argues that other structural differences with New York election law make the Connecticut statute constitutionally permissible. It is enough to say that given the similarity between the statutes, Plaintiffs have satisfied their burden to show a substantial likelihood of success on the merits.

### B. Remedies

#### 1. Remedy as to the unconstitutional statutes

Plaintiffs have shown a substantial likelihood of success on the merits that the three election statutes are unconstitutional. Assuming *arguendo* that Plaintiffs can show irreparable harm, the question then

becomes what remedy to provide in the form of a preliminary injunction.

Defendant could be enjoined from the enforcement of these three election statutes, either in whole or in part.[12] Although this court is a non-political actor, it needs to be sensitive to the practical ramifications of a decision on the political primary already in process. Thus, the statutes could be struck as unconstitutional as of some future date. This would give time to those candidates able to surmount the currently overly burdensome system an opportunity to file their paperwork with Defendant in the *manner currently prescribed by law*.[13] This would also give the Connecticut legislature a window of opportunity to minimize any political disruption by fashioning a permanent solution or an interim solution for just the 2002 race.

*2. Remedy as to Mr. Campbell's and Mr. Gomes's access to the 2002 ballot*

■ Plaintiffs also seek an order compelling Defendant to place Mr. Campbell and Mr. Gomes on their respective primary ballots. To be placed on the primary ballot, they ask to be required only to submit petitions containing signatures of 5% of enrolled party members, as set forth in CONN. GEN. STAT. §§ 9–405, 9–406. This is the process currently set forth for municipal office, modified to permit the petition circulator to be any enrolled party member residing in Connecticut.

The requested relief is denied. Plaintiffs seek not only to strike down election statutes but also to invite this court to replace the statutes with a process of its own fashioning. It is not within the power of a federal court to fashion state law. The requested relief would permit not only Mr. Campbell and Mr. Gomes access to the primary ballot in a *manner not currently prescribed by state law*, but presumably any other future plaintiff who could make a similar evidentiary showing. This is not a case where Mr. Campbell and Mr. Gomes already have sufficient evidence in hand to show that they undisputedly would qualify under any reasonable system the State might adopt. *See, e.g., McCarthy v. Briscoe*, 429 U.S. 1317, 1322–23, 97 S.Ct. 10, 50 L.Ed.2d 49 (1976) (Powell, J., sitting as Circuit Justice); *Molinari v. Powers*, 82 F.Supp.2d 57 (E.D.N.Y.2000) (Republican presidential candidates John McCain, Alan Keyes, and Steve Forbes).

Plaintiffs' proposed mechanism for ballot access is identical [14] to the system for primary ballot access for municipal office. As such, this court recognizes that their proposed relief is a system already adopted by the legislature, albeit for municipal office. But it is not the place of this court to automatically presume that the legislature intends to have the same primary ballot requirements for mayor, a municipal office, as for governor, a state office. *See Williams v. Rhodes*, 393 U.S. 23, 30, 89 S.Ct. 5, 21 L.Ed.2d 24 (1968) ("not ... every minor difference in the application of laws to different groups [is] a violation of our Constitution") (equal protection claim). This legislature has a range of options available to it to remedy the constitutional defects in these statutes. *See Tansley*, 315 F.Supp. at 519 ("states have broad discretion in formulating election poli-

---

**12.** *Defendant asserts that four district office races currently will have primaries.*

**13.** After such a date, prospective challengers such as Mr. Campbell and Mr. Gomes would in some ways be *worse off since they would* then have no mechanism to challenge the party-endorsed candidate, not even the current overly burdensome one.

**14.** Or at least *substantially the same*, since Plaintiffs seek a modification to permit the petition circulator to be any enrolled party member residing in Connecticut, not just enrolled party members residing in that district.

cies"). This court will not supplant the legislative judgment with its own.[15]

### C. Plaintiffs' Irreparable Harm

To establish irreparable harm, Plaintiffs must show a likelihood of irreparable harm that must be "imminent," not merely "remote and speculative." *JSG Trading Corp. v. Tray–Wrap, Inc.*, 917 F.2d 75, 80 (1990). Plaintiffs point to the "imminent" party primaries. Ironically, Defendant implicitly supports Plaintiffs' contention that the party primary elections are imminent. She argued at the preliminary injunction hearing to the effect that the primary elections are too imminent and that there is not sufficient time to permit Plaintiffs access to the ballot.[16] Plaintiffs argue that absent prompt relief, they will be forever denied the chance to run for the 2002 primary. This court will not give Plaintiffs an order compelling Defendant to place Mr. Campbell and Mr. Gomes on their respective primary ballots if they obtain signatures of 5% of enrolled party members. Whether or not Plaintiffs are irreparably harmed, their harm will not be cured by striking down the three election statutes. Nonetheless, this court cannot leave unaffected statutes with a substantial likelihood of being found to fail to meet constitutional muster. Accordingly, until a final determination herein, Defendant is hereby enjoined from enforcing the three statutes. What the legislature, Plaintiff, and Defendant may do in the interim will await their respective determinations. What shall be the final award of relief will await another day.

### IV. CONCLUSION

Plaintiffs' motion for a preliminary injunction, (Dkt. No. 4), is **granted in part** and **denied in part**. Defendant, the Connecticut secretary of state, is enjoined from enforcing Conn. Gen. Stat. §§ 9–400, 9–410(c), 9–416.

SO ORDERED.

---

**15.** Moreover, to force the State to accept a 5% voter signature requirement may be an implicit adjudication that the 5% voter signature requirement is itself not overly burdensome. It would touch upon Plaintiffs' equal protection claim, by implicitly concluding that one system is overly burdensome and the other system is not. This court declines to answer such questions implicitly.

**16.** This argument is meritless. After review of the evidence submitted at the preliminary injunction hearing, if the question of time were the only issue, there is sufficient time remaining to accommodate Plaintiffs' access to the primary ballot.