Jim **CAMPBELL, Pamela Byrnes, Ed Gomes, Common Cause of Connecticut, Connecticut Citizens Action Group, Mark Nielsen, Gordon Haave, Thomas J. Cullen, John Fixary and Jonathan Waters Wilcox Plaintiffs**

v.

Susan **BYSIEWICZ, Secretary of State of the State of Connecticut, Democratic Party of Connecticut, and the Republican Party of Connecticut Defendants**

No. CIV.3:02–CV–00488 PC.

United States District Court,
D. Connecticut.

Jan. 29, 2003.

William M. Bloss, Jacobs, Grudberg, Belt & Dow, P.C., New Haven, CT, Jeremy M. Creelan, Elizabeth Daniel, Brennan Center for Justice, NYU School Of Law, New York, NY, for Plaintiff.

Gregory T. D'Auria, Attorney General's Office, Hartford, CT, Jane R. Rosenberg, Eliot D. Prescott, Attorney General's Office, Hartford, CT, Jeremy M. Creelan, Brennan Center for Justice, NYU School Of Law, New York, NY, for Susan Bysiewicz.

Kevin N. Reynolds, Updike, Kelly & Spellacy, P.C., Hartford, CT, for Democratic Party Of Conn.

Richard P. Healey, Rome McGuigan Sabanosh, Hartford, CT, for Republican Party of Conn.

### RULING ON PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT

DORSEY, District Judge.

The first three named plaintiffs were actively seeking nominations of the Democratic or Republican political Parties (hereinafter "Parties"), which are also named defendants herein, in the November 2002 state elections. These three plaintiffs were seeking nominations for elective offices that embraced more than one town. The entire body of plaintiffs seeks adjudication of unconstitutional statutes, or parts thereof, that pertain to the process by which the Parties' nominees are placed on the ballot for the general election. The Secretary of State was named as the administrator of the election process including designation of Party nominees. In anticipation of the 2002 election, plaintiffs sought a preliminary injunction to be free of the primary requirement of fifteen percent (15%) of the delegates to the convention at which the Party named as its candidate for the office in question. *See* Conn. Gen.Stat. § 9–416. A preliminary injunction was warranted and the Secretary was enjoined from enforcing §§ 9–400(a) and 9–416, the 15% requirement, for the primary prior to the 2002 election. On appeal, the Second Circuit held that relief was not to be applied in 2002.

Since that appeal, the two political Parties, each of which has in their by-laws the 15% provision, were added as defendants. All parties herein agreed that further evidentiary hearings were not required and the issues would be decided on the record, i.e. the pleadings and the evidence offered in the prior hearing. The plaintiffs' Motion for Summary Judgment and the defendants' opposition memoranda frame the issues herein decided.

## I. BACKGROUND: THE 15% PROVISION

The record reflects that the Democratic and Republican Parties' by-laws include the statutory provision for a 15% delegate vote for a multi-town district office as a qualification to be on the primary ballot for a Party endorsement for election to such office. Preliminarily, serious questions have been found as to the provision constituting an unreasonable burden on free speech and association as they relate to the electoral process. *Campbell v. Bysiewicz*, 213 F.Supp.2d 152 (D.Conn.2002). The factual basis cited therein is incorporated here and is not repeated. Plaintiffs cite the following aspects of the primary law:

1) The parties endorse candidates for state-wide and multi-town offices in conventions, in keeping with state statutes and party rules, Conn. Gen. Stat. § 9–382, delegates to which are selected in accordance with party rules. Conn. Gen.Stat. § 9–390. Delegates may be challenged in a primary by a petition if such is signed by 5%, or less if so set by party rules, of the party members. Conn. Gen. Stat. § 9–407.

2) After the conventions, persons seeking party nominations can do so by means of a primary if they can show support of their candidacy by 15% of the convention delegates, Conn. Gen. Stat. § 9–400, a requirement also found in each party's rules.

3) Candidates for offices in single-town districts are similarly selected by the parties but participation in a post convention party primary requires only a petition in support of a challenger signed by 5% of the party voters in that district. Conn. Gen. Stat. §§ 9–405, 406.

4) Since the 15% provision was enacted in 1955, only one incumbent statewide official seeking re-election has been challenged in a primary.

5) Since 1955, no incumbent congressman has been challenged in a primary.

6) Connecticut General Assembly districts which include only one town, and are therefore subject to the 5% of the party registered voters for petitioners to be eligible to be on the primary ballot, have seen twice as many primaries as multi-town districts where primary eligibility requires the support of 15% of the delegates to the party convention which determines, at first blush, the party's endorsement for that office. There are 77 single town State Representative districts and 74 multi-town districts. All 36 State Senate seats are in multi-town districts. Massachusetts is apparently the only state, other than Connecticut, to use the 15% delegate standard for Democratic Party endorsement. Though characterizing the qualification as not unduly burdensome, neither case cited thoroughly analyzes the actual impact of the rule on persons actually seeking placement on a primary ballot. *See Langone v. Secretary of the Commonwealth*, 388 Mass. 185, 446 N.E.2d 43 (Mass.1983), *appeal dismissed sub. nom. Bellotti v. Connolly*, 460 U.S. 1057, 103 S.Ct. 1510, 75 L.Ed.2d 938 (1983); *Hopfmann v. Connolly*, 769 F.2d 24 (1st Cir.), *cert. den.* 479 U.S. 1023, 107 S.Ct. 863, 93 L.Ed.2d 819 (1987). The lack of discrimination and any preclusion of candidates cited in both cases, as relied on by. the Secretary of State, does not account for the degree of difficulty posed by the 15% rule. Plaintiffs' claim is neither that they are discriminated against nor that

they are totally excluded. Rather they claim that the 15% threshold is unduly burdensome, and they offer evidence showing the difficulty in meeting that threshold.

7) The 5% signature requirement adequately screens out minimally supported candidates.

8) Convention delegates are chosen by slates, i.e. blocs in number equal to the number of delegates allocated to each town, by a party's town committee or by party caucus. Conn. Gen. Stat. § 9–390. One wishing to be the candidate endorsed by the convention can seek the support of the convention delegates. If rebuffed by the town committee or caucus, the would-be nominee may, within two weeks, by petition signed by 5% of the party, seek election, in a delegate primary, of delegates supportive of his/her candidacy.

9) If unsuccessful at the convention, but supported by 15% of the delegates, the would-be candidate can be placed on the ballot for a candidacy primary. The 15% can be obtained from delegates selected by town committees, most frequently the case as a result of local choice by party rules, or caucuses. Both are usually controlled by local party leaders, more readily in town committees, who frequently commit delegates to incumbents or candidates in furtherance of local interests. Incumbents frequently select town delegates. Town committees have occasionally declined challengers' requests for a hearing. Getting to town committee meetings is difficult due to meetings being scheduled in conflict.

10) No matter what portion of a town committee, caucus, or delegate primary supports the person, up to

49%, he/she would get no delegate commitment since slate elections are all or nothing propositions. *See* Conn. Gen.Stat. §§ 9–424, 443, 444. Plaintiff Gomes received 40% of delegate primary votes but garnered no supportive delegates. An opponent who got 44% of the votes got all of the delegates. Plaintiff Campbell's slate in three town delegate primaries received 41.4%, 39.1% and 29.3% of the votes yet he garnered no delegates. A would-be candidate would thus have to solicit delegate support at three stages in every town in the district, 169 for state-wide offices: first in the election of the town committee member, second within the town committee when convention delegates are being selected or in a caucus, and third in conducting a delegate primary. If unsuccessful, solicitation of delegate support after the convention faces intractable commitments made by delegates when elected as such. Voter apathy results from repetition of several stages of delegate selection. Campaigns for delegates replicate the cost of actual office election campaigns, for each stage engaged in, often substantial in amount. A four-term Congressman and a Speaker of the State Assembly were unable to qualify for a primary for endorsement against an incumbent Governor in 1982 and 1986, in the latter case despite spending $900,000. Plaintiff Campbell's unsuccessful effort cost him $40,000, and a 1998 unsuccessful primary effort for a Congressional nomination cost $60,000.

11) For state-wide or national offices from 1956 to 2000, of eleven elections, three primaries were held. No incumbent, in six elections, was primaried. In six elections, only one incumbent governor faced a primary. Of sixteen United States Senate elections, there was only one party primary. Of 280 possible Congressional primaries, there were 28 primaries but no incumbent was primaried. Nationwide, in 1998, 19% of incumbent Congressmen were primaried and in 2000 the figure was 17%, and 34% for incumbent Senators. In 1970, the incumbent Democrat U.S. Senator did not enter a primary but ran as an independent.

12) From 1980 to 2000, for the state legislature there were 65 primaries in 802 multi-town district elections (7.6%). For the same period, in 859 single district elections there were 160 primaries (18.6%). In multi-town district elections, there were 669 incumbent candidates, of which nine (1.3%) faced a primary. In single town districts of 702 incumbents, 81 (11.5%) faced primaries.

13) In 2002, no one qualified for a primary for either party endorsement for state-wide office. There was only one primary for a Congressional election (of ten candidacies) and that was between non-incumbents. All other nominees included incumbents. Of two State Senatorial seats in which qualification was established for a primary, only one involved an incumbent. Of 220 possible state representative primaries in multi-town districts, five persons qualified of which two were incumbents whose districts were consolidated. No other primary challenged an incumbent. Of 148 possible primaries in multi-town districts, three were actually held. In single town districts, of 154 possible primaries, six were held.

14) While what other jurisdictions do is not determinative of Connecticut's choice in regulating the nomination process, nor is it the court's function nor role to dictate the state's choice of regulation(s), it is relevant that 44 states and the District of Columbia provide a semblance of control and order by using direct primaries for which a small percentage of petitioning voters, usually 5%, plus filing fees, qualifies. *See Storer v. Brown,* 415 U.S. 724, 739, 94 S.Ct. 1274, 39 L.Ed.2d 714 (1974); *Jenness v. Fortson,* 403 U.S. 431, 442, 91 S.Ct. 1970, 29 L.Ed.2d 554 (1971). Alternatively, five states allow conventions but a 5% rule applies to qualification for primaries. Where not mandated, parties in three states have chosen nomination by primary with a filing fee. Only Massachusetts limits access to statewide primary ballots by a 15% delegate requirement. It is relevant that the 15% petition requirement is viewed by persons actually involved in the process as extremely more, if not unduly, burdensome.

15) There was no evidence, and no claim is asserted, that the 15% rule is more effective to accomplish the purposes of the primary threshold. Though the Secretary of State argues to protect parties' right to associate and to regulate the number of candidates, she makes no showing that the single town 5% rule is not sufficient for that purpose.

## II. DISCUSSION

### A. Residency Requirement, Conn. Gen.Stat. § 9–410

Plaintiffs claim that the residency requirement for witnesses to petition signatures, Conn. Gen.Stat. § 9–410, unconstitutionally impedes candidates from communicating their message by denying them the "spokesperson of [their] choice." *See Krislov v. Rednour,* 226 F.3d 851, 862 (7th Cir.2000) (striking similar rule). According to § 9–410(c), petitions to be on a primary ballot may be circulated only by "an enrolled party member of a municipality in this state who is entitled to vote in the primary for which such candidacy is being filed." Plaintiffs cite *Buckley v. American Const. Law Found.,* 525 U.S. 182, 119 S.Ct. 636, 142 L.Ed.2d 599 (1999), which was applied in striking down an analagous restriction on ballot petition circulators in *Lerman v. Board of Elections,* 232 F.3d 135 (2d Cir.2000). In that case, the statute also impaired candidates' ability to gather sufficient petition signatures. In *Buckley,* an array of limitations was imposed on circulators of petitions seeking placement of initiatives on an election ballot. While recognizing that some regulation of the initiation procedure was not inappropriate, the court also found that unjustifiable restrictions would conflict with the right to engage in political conversations and to exchange ideas. *Buckley,* 525 U.S. at 192, 119 S.Ct. 636. When restrictions significantly inhibit communication with voters and are not justified by legitimate state interests, such as prevention of fraud and corruption, they will not withstand constitutional scrutiny. Restrictions which drastically reduce the persons available to circulate petitions, thereby diminishing protected speech and information to which voters are entitled, and which do not sufficiently serve the state's interests, would not be justified and therefore would be unconstitutional.

Defendant Bysiewicz argues that the issue is not related to the principal issue, the 15% rule, and therefore should not be reached. She also claims that the state's ultimate choice might not involve a peti-

tion, making the restriction on witness residency superfluous. Those claims lack merit.

Defendant Bysiewicz also claims that Connecticut's residency requirement is part of a distinguishable electoral regulatory scheme to which *Lerman* is inapplicable. That claim also lacks merit.

Applying *Buckley*, the Second Circuit in *Lerman* found New York's requirement that witnesses to signatures on ballot petitions be residents of the district in which the office is being voted unduly burdens an essential element of the voting process, and, having no bearing on asserted state interests, it was held to be unconstitutional. *See Lerman*, 232 F.3d at 153; *see also Molinari v. Powers*, 82 F. Supp 2d 57, 73–77 (E.D.N.Y.2000). Defendant's claim that *Lerman* is distinguishable is plainly without merit. Defendant suggests that *Lerman* was decided on the basis that the statute did not allow an elector to sign more than one petition. *See Def. Bysiewicz's Mem. In Opp. To Pl. Mot. For Summ. J.*, p. 29 (Nov. 21, 2002). That simply is not true. Instead, the court stated that "[w]e conclude that the section 6–132(2) witness requirement severely burdens interactive political speech and association rights protected by the First Amendment [ ] without advancing any legitimate or important state interest." *Lerman*, 232 F.3d at 139. Here, as in *Lerman*, defendants show no valid justification for a residency requirement.

■ Conn. Gen.Stat. § 9–410 is found to burden impermissibly First Amendment speech and association rights without advancing a legitimate state interest and is thus unconstitutional. Its enforcement is permanently enjoined.

## B. The 15% Provision

■ Plaintiffs claim that the 15% delegate rule/standard for placement on a primary ballot for a party nomination for governmental office in a multi-town district, or statewide, primary, as provided in Conn. Gen.Stat. §§ 9–400, 416, and the rules of the Republican and Democrat Parties, is unduly burdensome and thus violates the right of association in the political process as provided in Article I of the United States Constitution. The Secretary of State and the Parties rely on their right to regulate the election process to provide order and avoid confusion, a right not in dispute. *See Sugarman v. Dougall*, 413 U.S. 634, 647, 93 S.Ct. 2842, 37 L.Ed.2d 853 (1973); *Tashjian v. Republican Party of Connecticut*, 479 U.S. 208, 217, 107 S.Ct. 544, 93 L.Ed.2d 514 (1986). In addition, they assert the right to choose the regulation method. The Secretary's suggestion that plaintiffs attack the 15% rule as different from other similarly purposed rules lacks foundation. The issue is whether the 15% delegate requirement creates an impediment to inclusion on a primary ballot which, by unreasonably impairing both the right of individuals to put their names before voters and the right of voters to choices among various candidates, restricts access to primary ballots beyond that which is reasonably necessary to achieve the legitimate interests of the state and the Parties in regulating elections. There is no absolute right to be a candidate, nor do party members have an absolute right to have a candidate of their choice on a ballot. Nonetheless, exclusionary restrictions on primary candidates are limited to narrowly tailored restrictions, i.e. those reasonably necessary to achieve state's rights to regulate elections in keeping with state interests. *Burdick v. Takushi*, 504 U.S. 428, 433, 112 S.Ct. 2059, 119 L.Ed.2d 245 (1992). Such restrictions are characterized to be "the least drastic means to achieve [those] ends." *Illinois State Bd. of Elections v. Socialist Workers Party*, 440 U.S. 173, 185, 99 S.Ct. 983, 59 L.Ed.2d 230 (1979). State laws may pro-

172

vide for orderly and not chaotic elections, *Storer*, 415 at 730, 94 S.Ct. 1274, and restrict to some degree the right to be on a ballot, but the restriction may not be so burdensome as to strip the right to be a candidate and the commensurate right of voters to choices among various candidates to a status of meaninglessness. Defendant's recitation of Supreme Court decisions which sustain various single restrictive provisions do not include the scheme embodied in Connecticut's laws.

 As the facts are not in dispute, inferences to be drawn therefrom must be resolved in terms of whether, as a matter of law, *see* Fed.R.Civ.P. 56(c), the 15% rule unduly burdens the right of candidates to be considered and voters' right to a broad spectrum of candidates, *see Lubin v. Panish*, 415 U.S. 709, 716, 94 S.Ct. 1315, 39 L.Ed.2d 702 (1974) ("heavily burdened"). A three-fold test is to be applied: 1) the character and magnitude of the right allegedly violated; 2) the interests claimed to be advanced by the intrusion on the right; 3) the extent to which the interests asserted make it necessary to burden the rights in the manner challenged. *Anderson v. Celebrezze*, 460 U.S. 780, 789, 103 S.Ct. 1564, 75 L.Ed.2d 547 (1983); *Burdick v. Takushi*, 504 U.S. 428, 434, 112 S.Ct. 2059, 119 L.Ed.2d 245 (1992) ((when those rights are subject to "severe" restrictions, the regulation must be "narrowly drawn to advance a state interest of compelling importance") (quoting *Norman v. Reed*, 502 U.S. 279, 289, 112 S.Ct. 698, 116 L.Ed.2d 711 (1992)), but when a state election law imposes only "reasonable, nondiscriminatory restrictions" upon the First and Fourteenth Amendment rights of voters, "the State's important regulatory interests are generally sufficient to justify" the restrictions (citing *Anderson*, 460 U.S. at 788–89 and n. 9, 103 S.Ct. 1564)). The right to appear on a ballot, as an exercise of the right to associate within a political party and a means of presenting to voters a broad range of choices among candidates and their respective philosophies by which voters will be governed, is of such magnitude as to be considered a fundamental means by which democracy is preserved. *Williams v. Rhodes*, 393 U.S. 23, 30–31, 89 S.Ct. 5, 21 L.Ed.2d 24 (1968) ("Both of these rights, of course, rank among our most precious freedoms."); *NAACP v. Alabama ex rel. Patterson*, 357 U.S. 449, 460, 78 S.Ct. 1163, 2 L.Ed.2d 1488 (1958); *Anderson*, 460 U.S. at 787, n. 7, 103 S.Ct. 1564 (characterizing the rights as "fundamental" akin to Equal Right analysis); *see also Illinois Bd. Of Elections*, 440 U.S. at 184, 99 S.Ct. 983. Burdening those rights cannot be unduly restrictive lest their purpose be markedly diminished if not totally thwarted.

 Defendants' right to restrict access to primary ballots is accepted as a legitimate means of preventing candidates who have not even a minimal degree of voter support from appearing on the ballot. Requiring a showing of substantial support reduces waste and confusion by excluding from the ballot frivolous candidates by requiring a showing of substantial support. *Anderson*, 460 U.S. at 788–89, n. 9, 103 S.Ct. 1564. However, it is impermissible to restrict such access to a degree which so impairs the right of would-be candidates and voters to the benefits of free association and the fundamental democratic premise that elections provide a forum for robust and broad debate of governance issues. The absence of such is inconsistent with democracy as preclusive of candidacies representing varied views which may afford voters a reasonable breadth of meaningful choices as to how they wish to be governed.

 Plaintiffs flag not only the statistical deficiency in the number of primaries held in the 15% rule districts, and statewide, but also deficiencies in cases involv-

ing incumbents. They assert, without contradiction, the impetus of parties to rally around and to support incumbents. Party leaders, whose influence is not to be underestimated, as well as party rank and file, are inclined to support and affiliate with an incumbent due to an incumbent's influence over the flow of government benefits to a locality. The lack of actual primaries substantiates finding substantial impairment of the ability of prospective candidates to place themselves and their ideas before the voters for consideration. The substantial difference between the multi-town and statewide primaries and single-town districts supports the contention that the 15% rule more stringently impairs access than is reasonably necessary to achieve legitimate control of the election process. That appears to be the end result of the process, from election of town committees through solicitation of support in town committees, through campaigning for caucus selection of supportive delegates where applicable, through campaigning for supportive delegates to the convention, through qualifying for and conducting a delegate primary and solicitation of delegate support after a convention. No evidence suggests that the process established by the 15% rule more effectively screens out candidates so minimally supported as to avoid cluttering the ballot and impairing reasonable opportunities to candidates or voters to present and choose among positions on governance which have a reasonable likelihood of acceptance. Neither is there evidence which suggests that the 15% rule is the least restrictive method for excluding peripheral candidates.

It is significant to note that the 5% rule for single town primaries is the only step required of potential candidates, in contrast to the multiple steps required of candidates in multi-town and statewide primaries. Defendant Secretary argues that the 5% rule is not more rigorous but she thereby misses the point. The question is not whether the 5% is more narrowly tailored and thus required, nor is it determinative of the degree of burden of the 15% rule, as unduly so. The 5% rule only surfaces in contrast to the 15% rule, to show that a less stringent standard to qualify for a primary is at least equally effective in achieving the state's and the Parties' interests. The additional steps are not shown to be reasonably necessary over and above the 5% requirement which appears to the state and the Parties to suffice to assure orderly primary processes. The additional steps have all the quality of surplusage and additional burdens over what, under the 5% rule, would seem to be acceptable and sufficient to accomplish the asserted purpose. The additional steps appear to be unnecessary, unwarranted, and unreasonably limiting access to the primary ballot particularly as compared to the 5% rule. This is demonstrated in the statistics, which indicate substantially more primaries in 5% districts, and substantially more primaries for incumbent-filled house seats in 5% districts as opposed to 15% districts. It is found that the 15% rule so burdens candidates and voters' rights, which are correlatedly effected, as to substantially impair the reasonable exercise of these rights. *See Anderson*, 460 U.S. at 786, 103 S.Ct. 1564; *Bullock v. Carter*, 405 U.S. 134, 143, 92 S.Ct. 849, 31 L.Ed.2d 92 (1972). The excessive steps to which a would-be candidate subject under the 15% rule is akin to the requirement combination found to be constitutionally infirm as unnecessarily hampering ballot qualification, in contrast to simpler alternatives. *Rockefeller v. Powers*, 78 F.3d 44, 45–46 (2d Cir.1996).

■ The 15% rule does not entirely serve the interests put forth by the state and the Parties. By limiting the candidates who appear on the ballot and thus

reducing the risk of voter confusion if they were required to wade through a sea of candidates, the 15% rule does permit a more orderly election. However, it so limits the number of candidates who can qualify to appear on primary ballots as to well nigh eliminate candidate opportunity and voter choice. Defendants do not show why the extent of the burden imposed is reasonably necessary to achieve an orderly election uncluttered by candidates with little support when a much less stringent process would achieve the desired end result. In *Anderson,* Justice Stevens referred, in a different factual situation, to inequality of the burden on different candidates. 460 U.S. at 794–94, 103 S.Ct. 1564. It is the totality of the restriction imposed that determines impermissibility of the burden on the right to ballot access. *Williams,* 393 U.S. at 34, 89 S.Ct. 5. The number of primaries is a proper measure of the burden imposed. *Storer,* 415 U.S. at 742, 94 S.Ct. 1274; *Green v. Mortham,* 155 F.3d 1332, 1337 (11th Cir.1998). *See also Lubin,* 415 U.S. at 716, 94 S.Ct. 1315. The small number of primaries in 15% districts or statewide, one for governor, none for U.S. Representative or Senator or Secretary of State, suggests a substantial degree of candidate exclusion. Based on all the evidence, the 15% rule "unfairly and unnecessarily burdens the 'availability of political opportunity.'" *Anderson,* 460 U.S. at 793, 103 S.Ct. 1564, *quoting Clements v. Fashing,* 457 U.S. 957, 964, 102 S.Ct. 2836, 73 L.Ed.2d 508 (1982) (plurality opinion) (quoting *Lubin v. Panish,* 415 U.S. at 716, 94 S.Ct. 1315). Although decided in a different context, *Storer* raises a pertinent question: "could a reasonably diligent . . . candidate be expected to satisfy the [statutory] requirements, or will it be only rarely that the unaffiliated candidate will succeed in getting on the ballot?" 415 U.S. at 742, 94 S.Ct. 1274.

Defendant Bysiewicz argues that the 15% rule is justified by the interest in protecting the right of association embodied in the political party. While the state may not impair the right to associate, either of the party or individual voters, that prohibition, from the First Amendment, does not insulate a party monopoly, particularly against insurgents within the party seeking to carry its banner. Further, it is not shown that the substantial impediments of the 15% rule further the parties' association rights. The 15% rule regulates the way in which the associational rights of parties and their members may be exercised. The fact that the Parties have adopted the 15% rule does not advance that claim, particularly when the Republican Party does not advance that argument here.

The Secretary advances the argument that an Equal Protection claim will not lie. As plaintiffs have not briefed that claim, it will not be considered.

### C. State Action and Parties

▉▉▉▉ Plaintiffs claim that the Parties' rules are subject to Constitutional rights. The process by which parties select candidates for a general election smacks substantially of the right of association, the right to choose who will speak for the party in a general election. The question framed is not whether parties have that right, which is undisputed, but rather what latitude do parties have in exercising the right. The states "have a major role to play in structuring and monitoring the election process, including primaries." *California Democratic Party v. Jones,* 530 U.S. 567, 572, 120 S.Ct. 2402, 147 L.Ed.2d 502 (2000). Thus intra-party competition can be required to be resolved in a democratic fashion. *Id.* However, state regulation of parties' internal processes must comport with limits set in the First Amendment. When the state prescribes an election process in which parties

are assigned a special role, parties' action becomes state action and is subject to Constitutional standards. *Id.* at 573, 120 S.Ct. 2402. Nonetheless, a party is free to choose those who would associate under its banner, concomitant with which is the right to choose not to associate with one whose position does not comport with the thoughts and views of the party's members, including the choice of nominees in general elections who run under its banner. *Id.* at 575, 120 S.Ct. 2402. *See Timmons v. Twin Cities Area New Party,* 520 U.S. 351, 372, 117 S.Ct. 1364, 137 L.Ed.2d 589 (1997) (Stevens dissenting). Thus California's blanket primary was held to intrude impermissibly in selecting a party's nominee as not narrowly tailored to the purposes on which it was claimed to be based. Though the state may not dictate a party's choice of its nominee, it may not stand by, nor openly endorse or foster, a process which freezes out the right of party members to participate in the process. Therefore, the party's rules by which it selects its nominees must be subject to the same limits as limits on state action. States may not interfere with the rights of association of parties and their members. States may neither unduly burden members' meaningful opportunities to become party's nominees nor their right to choices of nominees within a spectrum of ideas consistent with the party's and its members' views.

 As discussed in § B above, the 15% rule unduly limits ballot access to candidates from among a party's members and in turn the members' entitlement to choose party nominees whom the members believe best stand for the party's principles. Political parties have no existence of their own, as they are the manifestation of their members' choice to associate. The party becomes the entity which seeks to achieve, for the membership, the ends for which the association came to exist. This orderly group activity is protected by the First Amendment. *Kusper v. Pontikes,* 414 U.S. 51, 56–57, 94 S.Ct. 303, 38 L.Ed.2d 260 (1973). Those means and ends are not frozen in place but are subject to the views of members, who choose to associate to pursue the means and ends of governance in which they believe and which they support. Those means and ends become the means and ends of the party by whatever process the members choose them through the party rules.

 The defendant Democratic Party asserts two interests in relation to the 15% rule. First is its right to choose the method by which its nominees are selected. The second is to remain a viable association which seeks to use the political process to comport communities' governance with its philosophy. Neither interest, nor their furtherance by control over the selection process, is disputed. Nonetheless that process, here the 15% rule, may not unduly burden a member's access to the ballot as a party nominee. As discussed above, members have the right to seek parties' nominations, although they do not have a fundamental right to be the ultimate nominee. If a primary is provided as part of the process by which nominees are selected, party rules cannot establish qualifications to appear on primary ballots which so unreasonably restrict such access as to make meaningless a member's right to be considered for nomination, nor a member's meaningful right to choose a nominee who can show a modicum of support, rights which are tightly interwoven and not readily neatly separated. *Bullock v. Carter,* 405 U.S. 134, 143, 92 S.Ct. 849, 31 L.Ed.2d 92 (1972). Parties' rightful role in the political process, i.e. as the rallying body by which groups seek to bring to the community's governance their shared views, warrants some steps to preserve their political viability. It does not justify so markedly restricting access to

primary ballots as to strip individual party members of the right of access to the ballot nor the right to choose broadly among candidates of varying views within the framework of the party's principles. Exclusion from an opportunity to be a party's candidate burdens the right of political association. *Anderson,* 460 U.S. at 787–88, 103 S.Ct. 1564. Competition for a party's nomination contributes to its vitality. The party's exclusion from the primary ballot of would-be nominees who have a modicum of support with the party's ranks not only deprives the membership of meaningful choices of nominees but adversely affects party viability. Members of a party will tend to stray from the ranks if they are deprived of the chance to vote in support of would-be nominees by overly stringent primary qualifications. *Smith v. Board of Election Commissioners,* 587 F.Supp. 1136, 1150 (N.D.Ill.1984). The fewer the choices of nominees of the party available to party members, the less attractive the party will be to the members and the greater the tendency for party viability to suffer. The ability of a party's leadership to select party nominees "is no substitute for the party members ability to select their own nominee," which may diverge from the leaders' choice. *California Democratic Party v. Jones,* 530 U.S. at 567, 581. The Democratic Party correctly notes that interference with its right of association is an interference with the right of association of its members. *See Democratic Party of the United States v. Wisconsin ex rel La Follette,* 450 U.S. 107, 122, 101 S.Ct. 1010, 67 L.Ed.2d 82 (1981); *Sweezy v. New Hampshire,* 354 U.S. 234, 250, 77 S.Ct. 1203, 1 L.Ed.2d 1311 (1957). That right is an essential element of the candidate selection process. *Nader v. Schaffer,* 417 F.Supp. 837, 844 (D.Conn. 1976). The flip side of that principle is that an unreasonable and unnecessary curtailment, by party rule, on members' right of access to the primary ballot also inter-feres with their right of association; therefore, the party's right to association may not unduly burden its members rights to association. The Secretary incorrectly argues that plaintiffs advance a state interest in holding more primaries. Plaintiffs cite the dearth of primaries as reflecting the excessively burdensome effect of the 15% qualification rule.

The defendant Parties have inserted in their nominee selection process the 15% rule as a qualification for placement on the primary ballot. That this rule screens out would-be nominees who have little or no support within the ranks of party members does not violate the Constitution. However, as discussed above the Parties have exceeded what is reasonably required to preserve their lawful interests. By utilizing the 15% rule they have so burdened members' access to primary ballots in multi-town districts and state-wide, and their members' rights to a broad range of choices for party nominations, *see Illinois State Bd. of Elections,* 440 U.S. at 184, 99 S.Ct. 983, as to dilute their members' noted rights to meaninglessness. To use a phrase from the Democratic brief, it does not strike a valid balance in preservation of the right to ballot access while permitting orderly nominations and insuring the Parties' viability. To quote from that brief, the process "distributes a certain degree of power to the hundreds of party members who are town committee members, convention delegates, candidates, volunteers and so forth." *Def. Democratic Party of Conn.'s Mem. In Opp. To Pl. Mot. For Summ. J.,* p.3 (Nov. 27, 2002). Note the want of inclusion of Party members at large, which is exactly the problem. In large measure, the 15% rule markedly leaves them bereft of the opportunity to participate.

The prospect of reforming that rule, suggested in recited efforts of the Secre-

tary and perhaps other Party leaders, possibly nudged along by the prior preliminary injunction, is irrelevant. What may happen is purely speculative. It is no secret that this subject has been on the table for years without action. When the preliminary injunction was entered, Party leaders ignored the opportunity for the legislature, which then came into session, to take corrective measures, for the flimsiest of stated reasons. This court cannot and will not wait to sustain Constitutional rights in the speculative hope that politicians may eventually choose to respond. It is not to be said here that the court is forcing a response, nor specifically any particular response. States "have broad discretion in formulating election policies." *Nader*, 417 F.Supp. at 850, *aff'd mem.* 429 U.S. 989, 97 S.Ct. 516, 50 L.Ed.2d 602 (1976). All that is said here is that the process in place now unduly burdens the rights of the members of Parties and cannot stand. What is done by the state when the decision here is promulgated is the decision of the state and its governing officers and bodies.

It is through the Fourteenth Amendment that the First Amendment becomes enforceable, but only against state action. A state may not simply legislate a private entity into an arm of the state. *San Francisco County Democratic Central Committee v. Eu*, 826 F.2d 814, 825–26 (9th Cir.), *aff'd* 489 U.S. 214, 109 S.Ct. 1013, 103 L.Ed.2d 271 (1989). However, a private entity such as a political party becomes a state actor if it is endowed with powers under state law as it then acts "under color of state law" for the purposes of 42 U.S.C. § 1983. *Lugar v. Edmondson Oil Co.*, 457 U.S. 922, 935, 102 S.Ct. 2744, 73 L.Ed.2d 482 (1982). This principle would apply to the Parties, as here the state has delegated to them "the power to fix the qualifications of primary elections," being a state function; furthermore, they conduct primary elections "under state statutory authority." *Smith v. Allwright*, 321 U.S. 649, 660, 663–64, 64 S.Ct. 757, 88 L.Ed. 987 (1944); *California Democratic Party v. Jones*, 530 U.S. at 567, 120 S.Ct. 2402. Party action which affects primary elections under the auspices of state law constitutes state action. *Rockefeller v. Powers*, 74 F.3d 1367, 1374–75 (2d Cir.1995); *Montano v. Lefkowitz*, 575 F.2d 378, 383 n. 7 (2d. Cir.1978); *Langone*, 446 N.E.2d at 48. Where the Party, as authorized by state statute, becomes a state actor thereby, its rules are subject to the same Constitutional limitations as are state statutes. *See Terry v. Adams*, 345 U.S. 461, 469, 73 S.Ct. 809, 97 L.Ed. 1152 (1953).

If the law were not sufficient, as discussed above, to constitute the parties as state actors, the defendant Parties do not contest the question. The plaintiffs' Local Rule 9(c)(1) statement asserts, in part: "12. The Democratic Party acts under color of state law in connection with past, the upcoming and future Democratic primaries." Defendant Democratic Party's 9(c)(1) statement admits ¶ 12. By not filing a 9(c)(2) statement, the defendant Republican Party is deemed to have admitted the same assertion as to it in plaintiffs' ¶ 13. Local Rule 9(c)(1). The Secretary's statement characterizes plaintiffs' two assertions as legal conclusions and makes no response.

The Parties do have interests in the candidates designated to carry their banner in general elections. For the reasons discussed in § B above, the 15% rule is found to burden access to primary ballots to a degree that is far beyond what is reasonably necessary to protect those interests. Even though party interests may differ from state interests, where parties are deemed state actors they are not permitted to adopt rules found to be unconstitutional when adopted by the state. *See Smith v. Allwright*, 321 U.S. 649, 664, 64

S.Ct. 757, 88 L.Ed. 987 (1944); *California Democratic Party*, 530 at 573 n. 5, 120 S.Ct. 2402. The Parties' interests in primaries is protected by the right to limit primary voting and petition and witness signatures to party members. Conn. Gen. Stat. §§ 9–431(c), 9–406.

The decision here is seen as preserving and appropriately balancing the associational rights of the party and of its members by protecting members' ability "to identify those persons with whom they wish to associate" and allowing "them to play a part in determining the shared ideals of the party." *Tashjian*, 770 F.2d at 282. Put another way, the proper balance is struck, and no undue burden is imposed on a would-be candidate who, with reasonable diligence, can "be expected to satisfy the ... requirements" as opposed to it being only rarely that such a "candidate will succeed in getting on the ballot." *Storer*, 415 U.S. at 742, 94 S.Ct. 1274.

## III. CONCLUSION

Plaintiffs' motion for summary judgment (Doc. No. 63) is granted. Plaintiffs have established that the witness residency requirement, Conn. Gen.Stat. § 9–410, is unconstitutional, and it is so found and enforcement of that section is enjoined. Plaintiffs have further established that the 15% rule as embodied in Conn. Gen.Stat. §§ 9–400, 416 and in the rules of the defendants Democratic and Republican Parties, is unconstitutional, and it is also so found and enforcement of those sections and the correlated Parties' rules are also enjoined.

SO ORDERED.