United States Court of Appeals,

Eleventh Circuit.

No. 98-2042.

Henry GREEN, Plaintiff-Appellant,

v.

Sandra Barringer MORTHAM, Secretary of State, State of Florida, in her official capacity, Defendant-Appellee.

Sept. 24, 1998.

Appeal from the United States District Court for the Middle District of Florida. (No. 96-CV-1143-T-23A), Mark A. Pizzo, Magistrate Judge.

Before TJOFLAT, COX and HULL, Circuit Judges.

HULL, Circuit Judge:

In this ballot access case, Appellant Henry Green challenges the constitutionality of Florida's alternative qualifying fee and signature petition requirements for ballot access in a Congressional primary election.[1] The magistrate judge held that Florida's alternative ballot access requirements in a Congressional primary election are constitutional.[2] We affirm.

I. BACKGROUND

In the Spring of 1996, Henry Green, a registered Democrat, desired to run for the Congressional seat from Florida's Tenth Congressional District. Green first had to win the Democratic primary to appear as the Democratic candidate on the general election ballot. Green had two ways to qualify for the Congressional primary ballot.

---

[1] In this opinion, "Congressional" refers to only the United States House of Representatives.

[2] The parties consented to proceeding before the magistrate judge. *See* 28 U.S.C. § 636(c).

First, Green could pay a statutory qualifying fee equal to seven and a half percent of the annual salary for the office he sought, amounting to a $10,020 fee in 1996. Fla. Stat. Ann. § 99.092 (West Supp.1998).[3] This seven and a half percent qualifying fee represented the aggregate of three separate fees-a four and a half percent filing fee, a two percent election or trust fund assessment, and a one percent party assessment. *Id.*[4]

Alternatively, Green could file a petition with signatures of three percent of the registered Democratic voters in Florida's Tenth Congressional District. Fla. Stat. Ann. § 99.095 (West Supp.1998).[5] This petitioning alternative required 4,077 signatures. After swearing an intent to

---

[3]Although amended in 1997, § 99.092 in 1996 provided:

> Each person seeking to qualify for nomination or election to any office, except a person seeking to qualify pursuant to § 99.095 and except a person seeking to qualify as a write-in candidate, shall pay a qualifying fee, which shall consist of a filing fee and election assessment, to the officer with whom the person qualifies, and any party assessment levied, and shall attach the original or signed duplicate of the receipt for his or her party assessment or pay the same, in accordance with the provisions of § 103.121, at the time of filing his or her other qualifying papers. The amount of the filing fee is 4.5 percent of the annual salary of the office.... The amount of the election assessment is 1 percent of the annual salary of the office sought.... The amount of the party assessment is 2 percent of the annual salary.

Fla. Stat. Ann. § 99.092 (West Supp.1998).

[4]The filing fee component was divided between Florida's election campaign financing trust fund, the state's general revenue fund, and the candidate's political party. *Boudreau v. Winchester,* 642 So.2d 1, 1-2 (Fla.Dist.Ct.App.1994); *McNamee v. Smith,* 647 So.2d 162 (Fla.Dist.Ct.App.1994). The trust fund assessment went toward a quasi-judicial board to pursue complaints filed with the Division of Elections. *See Boudreau,* 642 So.2d at 1-2; *see also* Fla. Stat. § 106.24. The party assessment went to the candidate's political party. *Boudreau,* 642 So.2d at 2.

[5]Section 99.095 provides:

> A person seeking to qualify for nomination to any office may qualify to have his or her name placed on the ballot for the first primary election by means of the

2

qualify by petition, a candidate is given "forms in sufficient numbers to facilitate the gathering of [the requisite] signatures." Fla. Stat. Ann. § 99.095(2) (1982).

Green did not meet either requirement by the respective deadline. On May 21, 1996, the Florida legislature extended the deadlines to June 10 for a signature petition and to June 21 for paying the qualifying fee.[6] Green admits he made no effort to collect signatures and qualify by petition.

On June 12, 1996, Green filed this action against Florida's Secretary of State, Sandra Barringer Mortham ("the Secretary of State"), seeking a declaration that Florida's ballot access requirements for primary elections were unconstitutional, injunctions against enforcement of those requirements, and attorneys' fees and costs. Green also filed a motion for an injunction ordering that his name be placed on the 1996 Democratic primary ballot for the Tenth District Congressional seat.

---

petitioning process prescribed in this section. A person qualifying by this alternative method shall not be required to pay the qualifying fee or party assessment required by this chapter.

...

... A candidate for any federal, state, county, or district office to be elected on less than a statewide basis shall obtain the signatures of a number of qualified electors of the district, county, or other geographical entity equal to at least 3 percent of the total number of registered voters of the party by which the candidate seeks nomination that are registered within the district, county, or other geographical entity represented by the office sought, as shown by the compilation by the Department of State for the last preceding general election.

Fla. Stat. Ann. § 99.095(1), (3) (West Supp.1998).

[6]The deadlines were changed to alleviate any prejudice that might have resulted from another district court decision invalidating the configuration of Florida's Third Congressional District. *See Johnson v. Mortham,* 950 F.Supp. 1117, 1120 (N.D.Fla.1996).

The Secretary of State's Answer stipulated to the facts stated in Green's complaint and asserted that Florida's ballot access statutes for primaries were constitutional.

One day before the new deadline for paying the fee, the Democratic Congressional Campaign Committee and the Florida Democratic Party each donated $5000 to Green's campaign. Green timely paid the $10,020 qualifying fee under protest. Unopposed in the Democratic primary, Green ran in the general election and was defeated by the twenty-six-year Republican incumbent.

Although withdrawing his motion for preliminary injunctive relief, Green continued his request for declaratory relief, a permanent injunction, and attorneys' fees and costs. Green later amended his complaint to seek a refund of his $10,020 qualifying fee on the basis that it could have been used to run his campaign.

While the parties' cross-motions for summary judgment were pending, the Florida legislature reduced the statutory qualifying fee from seven and a half percent to six percent of an elective office's salary. *See* 1997 Fla. Laws, ch. 97-13, § 11; Fla. Stat. Ann. § 99.092 (West Supp.1998). This reduced the fee from $10,020 in the 1996 Congressional primary to $8016 for the 1998 primary.[7] Green's amended complaint challenged this statute as applied to him in 1996 and as would be applicable to him in the 1998 primary. The parties amended their cross-motions accordingly. After a hearing, the magistrate judge upheld Florida's ballot access requirements as constitutional,

---

[7]The 1998 fee would have been $8016 based on the Congressional salary as of July 1, 1997. However, on October 10, 1997, a 2.3% cost-of-living adjustment increased Congressional salaries from $133,600 to $136,672, resulting in a $8200 filing fee for the 1998 primary.

4

denying summary judgment to Green and granting summary judgment to the Secretary of State. Green appeals.[8]

## II. DISCUSSION

A. Qualification Statistics

Over the years, numerous candidates have run in Florida's party primaries for Congressional seats. From 1978 to 1988, Florida's qualifying fee was five percent of a Congressional salary. *See* 1977 Fla. Laws, ch. 77-175, § 6 (amended 1979). During those years, an average of forty-eight candidates qualified for each year of Congressional primaries. All candidates qualified by paying the five percent fee.

Between 1990 and 1998, the Florida legislature increased the qualifying fee first to six percent and then to seven and a half percent, but later decreased the fee back to six percent. *See* 1989 Fla Laws, ch. 89-338, § 8 (increasing the fee to six percent effective January 1, 1990); 1991 Fla. Laws, ch. 91-107 § 1 (increasing the fee to seven and a half percent effective July 1, 1991); 1997 Fla. Laws, ch. 97-13, § 11 (decreasing the fee back to six percent effective January 1, 1998). The table below summarizes the recent qualification statistics for Congressional primary elections in Florida:

| Year | Qualifying Fee (percent of salary) | Number of Candidates Qualifying[9] | Number Qualifying by Paying Fee | Number Qualifying by Petition |
|---|---|---|---|---|
| 1990 | 6% | 45 | 45 | 0 |

---

[8]The magistrate judge first addressed ripeness, mootness, and standing concerns and held Green's claims justiciable. The Secretary of State did not cross-appeal.

[9]Florida had nineteen Congressional districts in the 1980s and twenty-three in the 1990s.

| 1992 | 7.5% | 87 | 68 | 19 |
| 1994 | 7.5% | 58 | 42 | 16 |
| 1996 | 7.5% | 59 | 38 | 21 |
| 1998 | 6% | 29 | 20 | 9 |

_____

Notably, when Florida increased the fee to seven and a half percent in 1992, the number of Congressional candidates qualifying for party primaries did not decrease but increased to the highest number of all years for which the parties submitted evidence in this case. When the fee was decreased back to six percent in 1998, there was no accompanying rise in the number of candidates qualifying.

B. *Anderson* 's Balancing Test

The Constitution provides that states may prescribe "[t]he Times, Places and Manner of holding Elections for Senators and Representatives." U.S. Const. art I, § 4, cl. 1. The Supreme Court long has recognized that states have important and compelling interests in regulating the election process and in having ballot access requirements. *Burdick v. Takushi,* 504 U.S. 428, 433, 112 S.Ct. 2059, 119 L.Ed.2d 245 (1992); *Anderson v. Celebrezze,* 460 U.S. 780, 788 & n. 9, 103 S.Ct. 1564, 75 L.Ed.2d 547 (1983); *see also Lubin v. Panish,* 415 U.S. 709, 715, 94 S.Ct. 1315, 39 L.Ed.2d 702 (1974); *Jenness v. Fortson,* 403 U.S. 431, 442, 91 S.Ct. 1970, 29 L.Ed.2d 554 (1971). The states'

6

compelling interests include maintaining fairness, honesty, and order, *Burdick,* 504 U.S. at 433, 112 S.Ct. 2059, minimizing frivolous candidacies, *Lubin,* 415 U.S. at 715, 94 S.Ct. 1315, and "avoiding confusion, deception, and even frustration of the democratic process," *Jenness,* 403 U.S. at 442, 91 S.Ct. 1970. *See also Anderson,* 460 U.S. at 788 & n. 9, 103 S.Ct. 1564. These same Supreme Court cases also recognize candidates' constitutional rights under the First and Fourteenth Amendments to associate for political ends and to participate equally in the electoral process. *See Burdick,* 504 U.S. at 433, 112 S.Ct. 2059; *Anderson,* 460 U.S. at 787-88, 103 S.Ct. 1564; *Lubin,* 415 U.S. at 716-18, 94 S.Ct. 1315; *Jenness,* 403 U.S. at 440, 91 S.Ct. 1970. Therefore, in *Anderson,* the Supreme Court set forth the test for considering whether a state's ballot access requirements impermissibly infringe a candidate's constitutional rights.

The Supreme Court instructed that the courts first must weigh "the character and magnitude of the asserted injury to the rights protected by the First and Fourteenth Amendments that the plaintiff seeks to vindicate" against "the precise interests put forward by the State as justifications for the burden imposed by its rule," taking into consideration "the extent to which those interests make it necessary to burden the plaintiff's rights." *Anderson,* 460 U.S. at 789, 103 S.Ct. 1564; *see also Tashjian v. Republican Party of Connecticut,* 479 U.S. 208, 213-14, 107 S.Ct. 544, 93 L.Ed.2d 514 (1986). This Court has described the *Anderson* test as a "balancing approach" in several decisions. *See, e.g., Bergland v. Harris,* 767 F.2d 1551, 1553-54 (11th Cir.1985) (describing *Anderson* as rejecting a "litmus-paper test" and adopting "the balancing approach"); *Libertarian Party of Florida v. State of Florida,* 710 F.2d 790, 793 (11th Cir.1983) (stating "the test is whether the legislative requirement is a rational way to meet this compelling state interest").

C. Post-*Anderson* Decisions

We would proceed immediately to applying *Anderson* 's balancing test were it not for a more recent decision of this Court finding uncertainty about the standard to be applied. In *Duke v. Cleland,* 954 F.2d 1526 (11th Cir.1992), this Court noted that although *Anderson* "deviated from the strict scrutiny model of analysis," the Supreme Court in *Norman v. Reed,* 502 U.S. 279, 112 S.Ct. 698, 116 L.Ed.2d 711 (1992), "returned to the traditional strict scrutiny analysis in striking down two provisions of an Illinois law that made it difficult for a new political party to obtain a position on the ballot." *Duke,* 954 F.2d at 1530 (citing *Norman v. Reed* ). Thus, the *Duke* court found "uncertainty in the specific standard to be employed," but held that the plaintiffs seeking an injunction were unlikely to prevail "even under a strict scrutiny analysis." *Id.*

A few months after *Duke,* the Supreme Court decided *Burdick v. Takushi,* 504 U.S. 428, 112 S.Ct. 2059, 119 L.Ed.2d 245 (1992), which sheds further light on the standard for analyzing state election laws that burden First and Fourteenth Amendment rights. In *Burdick,* the Supreme Court stated that "the mere fact that a State's system "creates barriers ... to limit the field of candidates from which voters might choose ... does not of itself compel close scrutiny.' Instead, as the full Court agreed in *Anderson,* a more flexible standard applies." *Id.* at 433-34, 112 S.Ct. 2059 (internal citations omitted). After repeating the *Anderson* test, the Supreme Court in *Burdick* instructed specifically how to apply that test. Citing *Norman v. Reed,* the Supreme Court stated that when the First and Fourteenth Amendment rights "are subjected to "severe' restrictions, the regulation must be "narrowly drawn to advance a state interest of compelling importance.' " *Id.* at 434, 112 S.Ct. 2059. Then citing *Anderson* again, the Supreme Court continued that "when a state election law provision imposes only "reasonable, nondiscriminatory restrictions' " on those constitutional rights,

then " "the State's important regulatory interests are generally sufficient to justify' the restrictions."

*Id.*

A few months after *Burdick* this Court addressed the *Anderson* test again. In *Fulani v. Krivanek,* 973 F.2d 1539 (11th Cir.1992), this Court stated that "the approach used by the *Anderson* Court can be described as *a balancing test* that ranges from strict scrutiny to a rational-basis analysis, depending on the circumstances." *Id.* at 1543 (emphasis added). After that description, this Court in *Fulani* also noted that in *Burdick v. Takushi,* "the Supreme Court reiterated the *Anderson* test and reaffirmed that "to subject every voting regulation to strict scrutiny and to require that the regulation be narrowly tailored to advance a compelling state interest ... would tie the hands of States seeking to assure that elections are operated equitably and efficiently.' " *Id.* (quoting *Burdick,* 504 U.S. at 434, 112 S.Ct. 2059).[10]

After this review, we conclude that the *Anderson* balancing test still controls challenges to ballot access requirements and proceed to apply that test in the manner instructed in *Burdick.*

D. Florida's Statutes Are Reasonable and Non-Discriminatory

The first step is to determine whether Florida's alternative qualifying fee and signature petition requirements impose reasonable, non-discriminatory restrictions or severe restrictions. We readily conclude Florida has adopted reasonable, nondiscriminatory ballot access restrictions for several reasons.

---

[10]The *Fulani* court did observe that *Burdick, Tashjian,* and *Anderson* each involved challenges based solely on the First Amendment and not equal protection. *Id.* Nonetheless, the *Fulani* court cited this Court's prior decision in *Bergland v. Harris,* 767 F.2d 1551, 1552 (11th Cir.1985), and held that "[i]n this circuit, however, equal protection challenges to state ballot-access law are considered under the *Anderson* test." *Id.*

9

First, filing fees have long been considered a reasonable, non-discriminatory means of regulating ballot access so long as there is an alternative means of ballot access as exists in Florida's signature petition alternative. *See Lubin v. Panish,* 415 U.S. 709, 718-19, 94 S.Ct. 1315, 39 L.Ed.2d 702 (1974); *Bullock v. Carter,* 405 U.S. 134, 144-45, 92 S.Ct. 849, 31 L.Ed.2d 92 (1972). This Court already upheld the constitutionality of Florida's filing fee in 1994 when it was four and half percent of the annual salary of the office sought, noting that "an alternative method is also available." *Little v. Florida Dept. of State,* 19 F.3d 4, 5 (11th Cir.1994). In *Little,* this Court also noted that a filing fee of up to five percent of the salary of the state office sought had been upheld in *Adams v. Askew,* 511 F.2d 700, 704-05 (5th Cir.1975).[11]

Second, conceding that a five percent qualifying fee has been held constitutional, Green presents no evidence that raising the fee to seven and a half percent reduced the total number of people qualifying for major party primaries or in any other manner unnecessarily burdened his constitutional rights given the petition alternative. Indeed, when the fee was lowered back to six percent in 1998, there was no concomitant increase in candidates qualifying. Thus, we agree with the Florida appellate courts that have held that Florida's qualifying fee of seven and a half percent of the annual salary of the office sought in 1996 is reasonable. *Boudreau v. Winchester,* 642 So.2d 1 (Fla.Dist.Ct.App.1994) (upholding total seven and a half percent qualifying fee against challenge to its partial disbursement to candidate's party and to trust fund); *McNamee v. Smith,* 647 So.2d 162 (Fla.Dist.Ct.App.1994) (same).

---

[11]This Court adopted as binding precedent all Fifth Circuit decisions prior to October 1, 1981 and all Fifth Circuit Unit B decisions after October 1, 1981. *Bonner v. City of Prichard,* 661 F.2d 1206, 1209 (11th Cir.1981) (en banc); *Stein v. Reynolds Securities, Inc.,* 667 F.2d 33, 33 (11th Cir.1982).

10

Turning to the petition alternative, the Supreme Court has upheld petition requirements more onerous than the three percent requirement at issue here. *Jenness v. Fortson,* 403 U.S. 431, 438-39, 91 S.Ct. 1970, 29 L.Ed.2d 554 (1971) (finding it constitutional to require signatures from five percent of electorate within 180 days). Addressing Florida's ballot access restrictions in particular, this Court already has upheld another section of Florida's election code that requires *minor* political parties to file a petition signed by three percent of the state's registered voters in order to have the names of its candidates placed on ballots for *statewide* offices. *Libertarian Party of Florida v. State of Florida,* 710 F.2d 790 (11th Cir.1983) (upholding Fla. Stat. Ann. § 99.096(1) (West 1982)); *see also U.S. Taxpayers of Florida v. Smith,* 871 F.Supp. 426 (N.D.Fla.1993), *aff'd,* 51 F.3d 241 (11th Cir.1995).

Thus, Florida's petition alternative for *major*-party candidates is likewise reasonable, especially under the particular facts here. In 1998, candidates had three months-or approximately ninety-six days-to collect signatures. Green needed to collect approximately fifty-two signatures per day. The magistrate judge aptly noted that Green could comply by asking five volunteers each to collect ten signatures a day. Moreover, Green admits that he never tried to collect signatures. Some *Libertarian* plaintiffs "testified they had not even attempted to undertake a petition drive because in their view the 3% requirement was simply impossible to meet." *Id.* at 794. Thus, this Court in *Libertarian* concluded that those plaintiffs' "[c]onclusory allegations cannot prevail." *Id.* Likewise, Green's conclusory allegations about the three percent petition requirement here do not show that the signature requirement is unreasonably burdensome.

We recognize that one distinction between *Libertarian* and Green's claims is that only registered Democratic voters in the Tenth Congressional District may sign Green's petition.

11

Although the available pool of voters is smaller, the number of signatures required is also smaller.[12] Green's petitioning efforts are eased by the limited geographic area in which eligible signers live. Green stresses several other candidates attempted petitioning but failed to obtain the requisite number of signatures. However, since 1992, sixty-five candidates have qualified for Congressional seats in Florida's major party primaries by petition, which defeats Green's argument.

Green also complains that Florida charges a verification fee of ten cents per signature or the actual cost of verification, whichever is less. Fla. Stat. Ann. § 99.097(4) (West Supp.1998).[13] However, this does not make Florida's petition requirement unreasonable or unduly burdensome for two reasons. First, a candidate also may collect fifteen percent more than the required number of signatures and thereby qualify to pay for only a random sampling of the signatures to be checked. Fla. Stat. Ann. § 99.097(2).[14] Second, the verification fee is waived for candidates who swear that the charges impose an undue burden on their resources. Fla. Stat. Ann. § 99.097(4).[15]

After acknowledging Florida's charges for verifying signatures, this Court in *Libertarian* likewise pointed out that "Florida provides petitions free of charge," and that although "[c]ounty election supervisors charge 10 cents per signature to cover the costs of verifying the petitions, ...

---

[12]The plaintiffs in *Libertarian* needed 144,492 signatures statewide, *id.* at 792, whereas Green needed only 4,077 from the Tenth Congressional District.

[13]"The supervisor shall be paid the sum of 10 cents for each signature checked or the actual cost of checking such signature, whichever is less...." Fla. Stat. Ann. § 99.097(4).

[14]"When a petitioner submits petitions which contain at least 15 percent more than the required number of signatures, the petitioner may require that the supervisor of elections use the random sampling verification method in certifying the petition." Fla. Stat. Ann. § 99.097(2).

[15]"However, if a candidate ... cannot pay such charges without imposing an undue burden on personal resources or upon the resources otherwise available to such candidate ..., such candidate ... shall, upon written certification of such inability given under oath to the supervisor, be entitled to have the signatures verified at no charge." Fla. Stat. Ann. § 99.097(4).

they may use random sampling techniques which reduce the number of signatures checked and therefore the cost." *Libertarian,* 710 F.2d at 794. Like the plaintiffs in *Libertarian,* Green has "cited no case holding that states must provide free access to the ballot in all circumstances." *Id.*[16]

Having concluded that Florida's fee and petition alternatives impose reasonable restrictions on ballot access, we also conclude that the requirements are justified by the state's compelling objectives. As noted above, the Supreme Court long has emphasized the importance of restricting ballot access: "in requiring some preliminary showing of a significant modicum of support before printing the name of a political organizations's candidate on the ballot-the [state's] interest, if no other, [is] in avoiding confusion, deception, and even frustration of the democratic process at the general election." *Jenness,* 403 U.S. at 442, 91 S.Ct. 1970. Florida's strong regulatory interests are sufficient to justify the reasonable restrictions at issue here. *See Burdick,* 504 U.S. at 434, 112 S.Ct. 2059 (explaining *Anderson* as holding that "when a state election law provision imposed only "reasonable, nondiscriminatory restrictions' " then " "the State's important regulatory interests are generally sufficient to justify' the restrictions"); *Libertarian,* 710 F.2d at 793 (noting that under *Burdick,* a "state's important regulatory interests are generally sufficient to justify reasonable restrictions").

E. Other States' Filing Fees and Petition Requirements

Green argues at length that this Court must find Florida's ballot access requirements unconstitutional because most other states either charge fees that are less than Florida's or require

---

[16]After *Libertarian,* this Court held it was unconstitutional for Florida categorically to exclude minor parties from the waiver of the verification fee that was available to indigent major party candidates. *Fulani v. Krivanek,* 973 F.2d 1539. 1547 (1992). However, Green sought ballot access in a major party primary and thus the charges were waivable.

fewer signatures for petitions. We disagree. There is a range of fees and signature requirements that are constitutional, and the Florida legislature is free to choose its ballot access requirements from that constitutional spectrum. The fact that Florida may be at the high end of that range does not make its ballot access restrictions unconstitutional. The shortcomings of such a comparative approach were recognized in *Libertarian:*

> First of all, the argument that Florida's 3% requirement must be stricken as unconstitutionally burdensome because a majority of states protect interests similar to Florida's by imposing a lesser requirement is unavailing. A court is no more free to impose the legislative judgments of other states on a sister state than it is free to substitute its own judgment for that of the state legislature.

710 F.2d at 793-94 (internal citations omitted). In this case, as in *Libertarian,* this Court cannot impose the legislative judgments of sister states on Florida but instead must determine whether Florida's legislative judgment expressed in its ballot access requirements passes constitutional muster. It does.

### III. CONCLUSION

We conclude that Florida's qualifying fee of seven and a half percent in 1996 and six percent in 1998 and alternative signature petition for ballot access for Congressional offices, are reasonable, nondiscriminatory restrictions, further compelling state interests, and do not unduly burden Green's constitutional rights. Therefore, the district court's entry of judgment for Defendant Secretary of State is AFFIRMED.