[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 20-13360-D

_____

THE NEW GEORGIA PROJECT,
REAGAN JENNINGS,
CANDACE WOODALL,
BEVERLY PYNE,

Plaintiffs - Appellees,

versus

BRAD RAFFENSPERGER,
in his official capacity as the Georgia Secretary of State
and the Chair of the Georgia State Election Board,
REBECCA N. SULLIVAN,
DAVID J. WORLEY,
MATTHEW MASHBURN,
AHN LE,
in their official capacities as Members of the
Georgia State Election Board,

Defendants - Appellants,

MARY CAROLE COONEY, et al.,

Defendants.

_____

On Appeal from the United States
District Court for the Northern District of Georgia

_____

Before WILSON, GRANT, and LAGOA, Circuit Judges.

GRANT, Circuit Judge:

The United States Constitution still gives States the power to set the "Times, Places and Manner of holding Elections for Senators and Representatives." U.S. Const. art. I, § 4, cl. 1. And that power "is matched by state control over the election process for state offices." *Clingman v. Beaver*, 544 U.S. 581, 586 (2005). To be sure, "[n]o right is more precious in a free country than that of having a voice in the election of those who make the laws under which, as good citizens, we must live." *Burdick v. Takushi*, 504 U.S. 428, 441 (1992) (internal quotation marks omitted). But we also know that "the right to vote is the right to participate in an electoral process that is necessarily structured to maintain the integrity of the democratic system." *Id.*

Here, the district court misapplied the *Anderson-Burdick* framework when it enjoined the State defendants' enforcement of a long-standing Georgia absentee ballot deadline, which requires ballots to be received by 7:00 p.m. on Election Day to be counted. *See* O.C.G.A. § 21-2-386(a)(1)(F); O.C.G.A. § 21-2-403. Instead, the district court manufactured its own ballot deadline so that the State is now required to count any ballot that was both postmarked by and received within three days of Election Day. And though our dissenting colleague suggests that we should defer to the district court's judgment on this issue, the law does not allow us to step back: "if the trial court misapplies the law we will review and correct the error without deference to that court's determination." *Haitian Refugee Ctr., Inc. v. Baker*, 953 F.2d 1498, 1505 (11th Cir. 1992).

2

Georgia has asked us to put its law back into force by staying the district court's injunction.  Under *Nken v. Holder*, parties are entitled to a stay if they show (1) that they will likely succeed on the merits; (2) irreparable injury absent a stay; (3) that the stay will not substantially injure the other interested parties; and (4) that a stay is in the public interest.  556 U.S. 418, 434 (2009).  Because the State defendants have met all four prongs of the *Nken* test, we grant their motion to stay the injunction.[1]

First, likelihood of success on the merits.  As we have already indicated, the State defendants satisfy this standard because the district court did not properly apply the appropriate framework.  Under *Anderson* and *Burdick*, courts must weigh the "character and magnitude of the burden the State's rule imposes" on the right to vote "against the interests the State contends justify that burden, and consider the extent to which the State's concerns make the burden necessary." *Timmons v. Twin Cities Area New Party*, 520 U.S. 351, 358 (1997) (internal quotation marks omitted).  If a State's rule imposes a "severe burden" on the right to vote, then the rule may survive only if it is "narrowly tailored" and only if the State advances a "compelling interest." *Id.*  But if the rule imposes only "reasonable, nondiscriminatory restrictions," then "a State's important regulatory interests will usually be enough" to justify it. *Id.* (internal quotation marks omitted).  As the Supreme Court explained in *Anderson* and then in *Burdick*, election laws

---

[1] We note that we write only for the parties' benefit.  As we recently held, because "orders concerning stays are not a final adjudication of the merits of the appeal," the "tentative and preliminary nature of a stay-panel opinion precludes the opinion from having an effect outside that case." *Democratic Exec. Comm. of Fla. v. Nat'l Republican Senatorial Comm.*, 950 F.3d 790, 795 (11th Cir. 2020) (internal quotation marks omitted).

"invariably impose some burden upon individual voters." *Burdick*, 504 U.S. at 433. That means strict scrutiny is not required for every voting regulation; to say otherwise would "tie the hands of States" as they seek "order, rather than chaos" in their elections. *Id.* (internal quotation marks omitted).

Here, Georgia's decades-old absentee ballot deadline is both reasonable and nondiscriminatory, while its interests in maintaining that deadline (especially now that absentee voting has already begun) are at least "important"—as the district court itself recognized—and likely compelling. The district court thus erred on two analytical fronts: first, in finding that Georgia's Election Day deadline severely burdened the right to vote; and second, in improperly weighing the State's interests against this burden. That is, the district court abused its discretion by applying the wrong legal standard—strict scrutiny. *See Grizzle v. Kemp*, 634 F.3d 1314, 1326 (11th Cir. 2011) (reversing a preliminary injunction because the district court's "application of strict scrutiny on review of the Plaintiffs' constitutional claims was error").

The district court offered only a few paragraphs of light analysis before concluding that the Election Day receipt deadline for absentee ballots places a severe burden on voters. In fact, the significant bulk of the district court's short discussion of the burden on voters was not about Georgia—it was a description of *another* district court decision from a *different* State, followed by the conclusion that "[t]he situation here is similar." *New Ga. Project v. Raffensperger*, --- F. Supp. 3d ---, No. 20-cv-01986-ELR, 2020 WL 5200930, at *24 (N.D. Ga. Aug. 31, 2020). The court then suggested that here, as there, a high number of absentee-

ballot requests due to COVID-19 "will lead to a potentially substantial backlog, increasing the possibility that voters will receive their ballots on a later date." *Id.* at *23–24. It seemed to assume that if *anyone's* ballot would be rejected because of the deadline, the burden would "be severe." *Id.* at *24.

These conclusions missed the mark. While the district court relied on the June 2020 primary election to prove that the Election Day deadline posed a burden on voters, it also ignored evidence that during that very primary—which also took place during the COVID-19 pandemic—the percentage of absentee ballots rejected as late was smaller than usual. The court offered no other analysis. In the end, as a legal matter, it is just not enough to conclude that if some ballots are likely to be rejected because of a rule, "the burden on many voters will be severe." *Id.*; *see also Burdick*, 504 U.S. at 433.

Indeed, a look at the evidence shows that Georgia's Election Day deadline does not implicate the right to vote at all. Georgia has provided numerous avenues to mitigate chances that voters will be unable to cast their ballots. Voters may request absentee ballots as early as 180 days before the election and may receive the ballots as early as 49 days before the election. *See* O.C.G.A. § 21-2-381(a)(1)(A); O.C.G.A. § 21-2-384(a)(2). They can return their ballots through the mail, hand-delivery, or a drop box; dozens of drop boxes are available through Election Day in numerous locations, and all jurisdictions have the authority to add them. *See* O.C.G.A. § 21-2-385; Ga. Comp. R. & Regs. 183-1-14-0.8-.14. Voters also have the option to participate in early in-person voting. O.C.G.A. § 21-2-385. Even those who have already requested and received an absentee ballot can vote in

5

person on Election Day if they properly cancel their absentee ballot. O.C.G.A. § 21-2-388. And though delays in the postal service *may* (not *will*) delay when some voters receive their absentee ballots, all of these avenues remain open to any and all voters.

The district court did not acknowledge these provisions or weigh how they mitigate the Election Day deadline's impact on the right to vote. Voters must simply take reasonable steps and exert some effort to ensure that their ballots are submitted on time, whether through absentee or in-person voting. Contrary to the district court's conclusion, then, no one is "disenfranchised." And the burden on a voter to ensure that a ballot is postmarked by Election Day is not meaningfully smaller than the burden of, say, dropping the ballot in a drop box at one's polling place on Election Day.

When the alleged burdens are not severe, a compelling state interest is not required. *Timmons*, 520 U.S. at 358. Here, Georgia's regulatory interest is more than enough to uphold its reasonable ballot-receipt restriction. The State defendants have presented several interests that justify the deadline. These include conducting an efficient election, maintaining order, quickly certifying election results, and preventing voter fraud. The district court acknowledged that these interests are "strong" and "important." *New Ga. Project*, 2020 WL 5200930, at *25. And that should have been enough. But the court, after elevating the burden voters face to find it severe, diminished the interests of the State in order to conclude that it did not show a compelling interest. Because the State's Election Day deadline imposes only a reasonable burden even on absentee voters who

6

receive their ballots later than usual, the State's interests easily survive the *Anderson-Burdick* framework. *Cf. Green v. Mortham*, 155 F.3d 1332, 1335 (11th Cir. 1998) (noting "states' compelling interests" in "maintaining fairness, honesty, and order" in the election process).

We add that the district court also erred in accepting the plaintiffs' novel procedural due process argument. The standard is clear: "[W]e must evaluate laws that burden voting rights using the approach of *Anderson* and *Burdick*." *Jacobson v. Florida Sec'y of State*, --- F.3d ---, No. 19-14552, 2020 WL 5289377, at *18 (11th Cir. Sept. 3, 2020). The district court, though, also evaluated Georgia's deadline under *Mathews v. Eldridge* and found that it additionally violated procedural due process. Yet it cited no binding cases from any court that apply the *Mathews* test to a State's election procedures. *New Ga. Project*, 2020 WL 5200930, at *25. And even if we could choose to innovate a new approach (which we cannot), we would see no reason to do so. The generalized due process argument that the plaintiffs argued for and the district court applied would stretch concepts of due process to their breaking point. And even looking at that approach in the most charitable light possible, it is conceptually duplicative of the specific test we have been instructed to apply under *Anderson* and *Burdick*.

The district court also wrongly suggested that a recent Supreme Court decision staying a lower court election order—an order that mandated counting Wisconsin absentee ballots postmarked after Election Day—supports its injunction. *New Ga. Project*, 2020 WL 5200930, at *24 (citing *Republican Nat'l Comm. v. Democratic Nat'l Comm.*, 140 S. Ct. 1205 (2020) (*RNC*)). The plaintiffs

7

are even more direct, stating that the Supreme Court "approved an extension of Wisconsin's election day receipt deadline."

Not so. The Supreme Court specifically noted that the district court's order extending the absentee ballot deadline was "not challenged in this Court." *RNC*, 140 S. Ct. at 1206. The Court emphasized that it considered only what it called the "narrow, technical" question of whether the Wisconsin district court erred by altering the election rules to permit absentee ballots postmarked *after* Election Day to be counted so long as they were received within one week of the election. *Id.* at 1206–07. Finding that the district court "fundamentally alter[ed] the nature of the election" and that the relief offered was not even requested by the plaintiffs, the Court stayed that portion of the district court's order. *Id.* at 1207. And it also repeated its mantra that "lower federal courts should ordinarily not alter the election rules on the eve of an election." *Id.*

That mantra has consistently pointed the Supreme Court in one direction—allowing the States to run their own elections. Since March, the Supreme Court has reviewed, by our count, seven emergency motions related to district court injunctions of state election laws due to COVID-19.[2] In six of those cases it has stayed the injunction or declined to vacate a stay issued by the circuit court. And

---

[2] *See RNC*, 140 S. Ct. at 1208 (granting stay); *Little v. Reclaim Idaho*, 140 S. Ct. 2616 (2020) (granting stay); *Tex. Democratic Party v. Abbott*, 140 S. Ct. 2015 (2020) (denying application to vacate Fifth Circuit's stay); *Thompson v. DeWine*, No. 19A1054, 2020 WL 3456705, at *1 (U.S. June 25, 2020) (denying application to vacate Sixth Circuit's stay); *Merrill v. People First of Ala.*, --- S. Ct. ---, No. 19A1063, 2020 WL 3604049 (U.S. July 2, 2020) (granting stay); *Clarno v. People Not Politicians Or.*, --- S. Ct. ---, No. 20A21, 2020 WL 4589742, at *1 (U.S. Aug. 11, 2020) (granting stay); *Republican Nat'l Comm. v. Common Cause R.I.*, --- S. Ct. ---, No. 20A28, 2020 WL 4680151, at *1 (U.S. Aug. 13, 2020) (denying stay).

in the one case where the Court denied the application for a stay, it did so only because the state officials and the plaintiffs had already agreed to settle the case. *See Republican Nat'l Comm. v. Common Cause R.I.*, --- S. Ct. ---, No. 20A28, 2020 WL 4680151, at *1 (U.S. Aug. 13, 2020). Here, we have no such agreement. And we are not on the eve of the election—we are in the middle of it, with absentee ballots already printed and mailed. An injunction here would thus violate *Purcell*'s well-known caution against federal courts mandating new election rules—especially at the last minute. *Purcell v. Gonzalez*, 549 U.S. 1, 4–5 (2006).

In sum, the State defendants have shown a high likelihood of prevailing on the merits, which is where much of the work gets done on a stay request. But the other factors matter too, and the defendants satisfy them. *See Nken*, 556 U.S. at 434.

Georgia will suffer irreparable harm absent a stay. When the district court bars "the State from conducting this year's elections pursuant to a statute enacted by the Legislature," unless the statute is unconstitutional, an injunction would "seriously and irreparably harm the State." *Abbott v. Perez*, 138 S. Ct. 2305, 2324 (2018) (footnote omitted); *see also Little v. Reclaim Idaho*, 140 S. Ct. 2616, 2617 (2020) (Roberts, C.J., concurring) ("[T]he State is likely to suffer irreparable harm absent a stay. Right now, the preliminary injunction disables Idaho from vindicating its sovereign interest in the enforcement of initiative requirements that are likely consistent with the First Amendment."). The plaintiffs, on the other hand, will not suffer irreparable injury due to the stay. Election Day is still over one month away and these plaintiffs may submit their absentee ballots (on time) or

9

take advantage of any of the other avenues that Georgia has made available to ensure that voters are able to cast their ballots.

And finally, a stay is in the public interest.  The Supreme Court has "repeatedly emphasized that lower federal courts should ordinarily not alter the election rules on the eve of an election." *RNC*, 140 S. Ct. at 1207.  Staying the district court's order here will prevent voter confusion, especially since Georgia has already mailed absentee ballots with instructions that the Election Day deadline applies.  And it will also serve the other interests (conceded by the district court to be "important") that Georgia has set forth—including its interests in conducting an efficient election, maintaining order, quickly certifying election results, and preventing voter fraud.  Simply put, a stay preserves the status quo and promotes confidence in our electoral system—assuring voters that all will play by the same, legislatively enacted rules.  "Confidence in the integrity of our electoral processes is essential to the functioning of our participatory democracy." *Purcell*, 549 U.S. at 4.

\*    \*    \*

Federal judges can have a lot of power—especially when issuing injunctions.  And sometimes we may even have a good idea or two.  But the Constitution sets out our sphere of decisionmaking, and that sphere does not extend to second-guessing and interfering with a State's reasonable, nondiscriminatory election rules.  COVID-19 has not put any gloss on the Constitution's demand that States—not federal courts—are in charge of setting those rules.  Because Georgia's decades-old Election Day deadline for absentee ballots does not threaten voting

rights, and is justified by a host of interests, we stay the district court's injunction of that deadline. Appellants' "Motion to Stay Injunction Pending Appeal" is **GRANTED**.

LAGOA, Circuit Judge, concurring:

I concur with Judge Grant. I write separately to address the merits of the district court's findings that (1) Georgia's decades-old election-day deadline for absentee ballots (the "Receipt Deadline") impermissibly burdened the voters' First and Fourteenth Amendment rights to associate and vote, and (2) Georgia's legislatively enacted election scheme somehow violated the voters' rights to procedural due process. I conclude that neither of these findings are supported by the Constitution. As such, I agree that the State has carried its burden of showing a strong likelihood of success on the merits (as well as the other elements required for a stay, although I do not discuss them here) and agree with Judge Grant that we should stay the district court's injunction pending appeal.

I.

All election laws burden the right to vote. Each provision of a state's election scheme, "whether it governs the registration and qualifications of voters, the selection and eligibility of candidates, or the voting process itself, inevitably affects—at least to some degree—the individual's right to vote and his right to associate with others for political ends." *Anderson v. Celebrezze,* 460 U.S. 780, 788 (1983). Examples abound. If a state requires that voters present a valid identification card in order to vote, any would-be voter who does not obtain and

12

present such a card will be prevented from voting. *See, e.g.*, *Crawford v. Marion Cnty. Election Bd.*, 553 U.S. 181, 202–03 (2008). If a state bans the use of write-in voting, any would-be voter whose preferred candidate did not qualify for the election will be prevented from voting for that candidate. *See, e.g.*, *Burdick v. Takushi*, 504 U.S. 428, 441 (1992). And, as relevant here, if a state imposes a strict deadline for the receipt of absentee ballots, any would-be voter who chooses to vote by absentee ballot and does not return his ballot by that deadline will be prevented from having his vote counted.

As evident from these examples, not all burdens on the right to vote are unconstitutional. To be sure, "voting is of the most fundamental significance under our constitutional structure." *Ill. State Bd. of Elections v. Socialist Workers Party*, 440 U.S. 173, 184 (1979). It is a "fundamental political right" that is "preservative of all rights." *Yick Wo v. Hopkins*, 118 U.S. 356, 370 (1886). But the Constitution also commits, via the Elections Clause, the regulation of the "Times, Places and Manner of holding Elections" to the States. U.S. Const. art. 1, § 4, cl. 1; *see also Cook v. Gralike*, 531 U.S. 510, 523 (2001) ("[T]he States may regulate the incidents of such elections, including balloting, only within the exclusive delegation of power under the Elections Clause.").

Against this backdrop of competing interests, federal courts must be chary of hearing challenges to a state's duly enacted election procedures—particularly when

13

brought at the eleventh hour. *See Purcell v. Gonzalez*, 549 U.S. 1, 4 (2006) ("Faced with an application to enjoin operation of [election] procedures just weeks before an election, the Court of Appeals was required to weigh, in addition to the harms attendant upon issuance or nonissuance of an injunction, considerations specific to election cases and its own institutional procedures."). Thus, in these cases, courts must apply a "flexible standard" to challenges involving state election laws. *Burdick*, 504 U.S. at 434. As the Supreme Court explained in *Burdick*:

> A court considering a challenge to a state election law must weigh "the character and magnitude of the asserted injury to the rights protected by the First and Fourteenth Amendments that the plaintiff seeks to vindicate" against "the precise interests put forward by the State as justifications for the burden imposed by its rule," taking into consideration "the extent to which those interests make it necessary to burden the plaintiff's rights."

> Under this standard, the rigorousness of our inquiry into the propriety of a state election law depends upon the extent to which a challenged regulation burdens First and Fourteenth Amendment rights. Thus, as we have recognized when those rights are subjected to "severe" restrictions, the regulation must be "narrowly drawn to advance a state interest of compelling importance." But when a state election law provision imposes only "reasonable, nondiscriminatory restrictions" upon the First and Fourteenth Amendment rights of voters, "the State's important regulatory interests are generally sufficient to justify" the restrictions.

*Id.* (citations omitted).

In this case, the only state election provision at issue on appeal is Georgia's Receipt Deadline for absentee ballots. That deadline, pursuant to Georgia law, requires absentee ballots to be received by 7:00 p.m. on Election Day in order to be

14

counted. *See* O.C.G.A. § 21-2-386(a)(1)(F). If a ballot is received by county election officials *after* that date and time—regardless of *when* the ballot was mailed or *why* it was received late—the ballot will not be tallied, and the voter who mailed the ballot will be deprived of exercising his right to vote in that election.

Every election cycle, at least some Georgians' votes are not counted due to this facially neutral Receipt Deadline. In 2018, for example, the district court noted that over 3,500 absentee ballots arrived after the Receipt Deadline and, as a result, were not counted. That figure represented 1.6% of all mail-in ballots for that cycle. During the June 2020 primary (the first statewide election held in Georgia during the COVID-19 pandemic), the number of late ballots rose to 7,281. That figure represented 0.67% of all mail-in ballots submitted in June. In fact, for each year of data presented to the district court, the percentage of ballots rejected as late fell somewhere between 0% and 1.6%.

Despite the fact that the percentage of Georgians who had their ballots rejected because they missed the Receipt Deadline actually *dropped* during the June 2020 election cycle (which, as noted above, occurred during the ongoing COVID-19 pandemic), the district court concluded that Georgia's Receipt Deadline was unconstitutional in light of the pandemic. Relying primarily on mail delays associated with the ongoing pandemic, the district court said that the strict Receipt

15

Deadline imposes "severe burdens on the right to vote" and will disenfranchise voters "through no fault of their own."

That conclusion was erroneous, and the State has more than carried its burden of showing a likelihood of succeeding on the merits of its appeal. In this regard, the district court's primary error was failing to conduct any independent analysis of the severity of the burden at issue. The district court did not, as we have previously instructed in *Greater Birmingham Ministries v. Secretary of State for Alabama*, 966 F.3d 1202, 1223 (11th Cir. 2020), compare the burden of utilizing the challenged mechanism (i.e., mailing the absentee ballot) to the alternatives provided by the state (e.g., utilizing a drop box). Nor did the district court attempt to analyze the burden in the abstract, as we did in *Common Cause/Georgia v. Billups*, 554 F.3d 1340, 1354 (11th Cir. 2009).

As explained by Judge Grant in the majority, conducting either of these analyses would have resulted in the denial of Plaintiffs' requested injunction. This is because Georgia already provides a number of alternatives to the absentee voter who fears missing an upcoming election deadline due to mail delays. The district court itself acknowledged as much. It stated that "there are *widely available* alternatives to voting by mail, including use of drop boxes or hand delivery." (emphasis added). But even those are not the only options. Georgia law also allows voters—in addition to utilizing the mail, drop boxes, or hand delivery—to vote in-

16

person early or on Election Day (even after originally requesting an absentee ballot).

*See* O.C.G.A. §§ 21-2-385, 21-2-388; Ga. Comp. R. & Regs. 183-1-14-0.6 to .14.

In fact, even if viewed only in the abstract, the burden attendant to the Receipt

Deadline still could not be characterized as severe.  Georgia law allows voters to

request their absentee ballots up to *180 days* before Election Day.  O.C.G.A. § 21-

2-381(a)(1)(A).  The voter who waits to return his absentee ballot until the very last

minute will be equally affected regardless of *when* the deadline is set.  In other

words, it is not the application of the nondiscriminatory Receipt Deadline that

deprives a voter from having his vote counted, it is his own lack of diligence in

returning his ballot.

Against this slight burden, Georgia asserts a sufficiently important state

interest in response: the ability to conduct an efficient election, to prevent voter

fraud, and to quickly certify its election results. *See Eu v. San Francisco Cnty.*

*Democratic Cent. Comm.*, 489 U.S. 214, 231 (1989) ("A State indisputably has a

compelling interest in preserving the integrity of its election process."); *Green v.*

*Mortham*, 155 F.3d 1332, 1335 (11th Cir. 1998) (noting that states have a compelling

interest in "maintaining fairness, honesty, and order" in elections).  The importance

of these interests is not seriously in dispute on appeal.  The district court itself

acknowledged that the State's proffered interests are both "strong" and "important."

Indeed, with the anticipated increased use of mail-in voting during these socially

17

distanced times, it is reasonable to assume that it will take longer to tabulate the absentee ballots than it would during previous elections. Arbitrarily extending the deadlines for receiving those absentee ballots will thus result in unnecessary delays in calculating the result of the election and will undermine voters' confidence in its accuracy.

Rather than conducting these analyses, the district court based its conclusion on *Republican National Committee v. Democratic National Committee*, 140 S. Ct. 1205 (2020) ("*RNC*"). But as Judge Grant notes, that case said nothing about the issue presented here. Instead, *RNC* was concerned with the deadline by which absentee ballots must be *sent* to the State, not the deadline by which absentee ballots must be *received* by the State. *See id.* at 1206 ("The District Court's order granting a preliminary injunction is stayed to the extent it requires the State to count absentee ballots postmarked after [election day]."). In fact, the Supreme Court explicitly limited its analysis to that "narrow question" and made clear that its decision "should not be viewed as expressing an opinion on the broader question of . . . whether other reforms or modifications in election procedures in light of COVID-19 are appropriate. *That point cannot be stressed enough*." *Id.* at 1208 (emphasis added). Nevertheless, the district court here disregarded that unambiguous directive and decided that the Supreme Court's decision supported its injunction. In other words, the district court rested its entire analysis on an interlocutory order directed at a

wholly unrelated issue. Because, on the record before us, Georgia has shown a likelihood of succeeding on its claim that this limited burden is justified by its important state interests, Georgia is entitled to a stay of the injunction pending appeal.

## II.

The district court did not end its analysis of the issue with *Anderson*/*Burdick*, however. Instead, the district court also analyzed the voting-rights issue through the lens of procedural due process. I agree with Judge Grant that the doctrine of procedural due process has no applicability to the present dispute. I write separately to explain, from my perspective, why this is so.

The Due Process Clause provides that no state shall "deprive any person of life, liberty, or property, without due process of law." U.S. Const. amend. XIV, § 1. Procedural due process is "a guarantee of fair procedure." *Zinermon v. Burch,* 494 U.S. 113, 125 (1990). In order to trigger its protections, however, a plaintiff must allege a constitutionally protected interest—a deprivation of life, liberty or property. So, "[w]hen we are evaluating claims that the State has unfairly deprived someone of liberty or property, it is appropriate first to ask whether the state action adversely affected any *constitutionally protected interest*." *Ohio Adult Parole Auth. v. Woodard*, 523 U.S. 272, 291 (1998) (Stevens, J., concurring in part and dissenting in part) (emphasis added). As such, "standard analysis under [the Due Process

19

Clause] proceeds in two steps: We first ask whether there exists a liberty or property interest of which a person has been deprived, and if so we ask whether the procedures followed by the State were constitutionally sufficient." *Swarthout v. Cooke*, 562 U.S. 216, 219 (2011).

In this case, the district court completely skipped the first step, and jumped immediately to analyzing whether the voters were at risk of being deprived of their liberty interests. But what interests are implicated? While the right to vote is certainly fundamental, this case does not implicate that right—at least not directly. Here, Plaintiffs claim a constitutionally protected interest in voting *absentee*. But the Supreme Court has unambiguously held that the right to vote *absentee* is not a fundamental interest that triggers Fourteenth Amendment protections. *See, e.g.*, *McDonald v. Bd. of Election Comm'rs of Chicago*, 394 U.S. 802, 807–08 (1969) ("It is thus not the right to vote that is at stake here but a claimed right to receive absentee ballots. Despite appellants' claim to the contrary, the absentee statutes, which are designed to make voting more available to some groups who cannot easily get to the polls, do not themselves deny appellants the exercise of the franchise . . . .").

Indeed, some courts have gone further still. In *Johnson v. Hood*, 430 F.2d 610 (5th Cir. 1970),[1] our predecessor court said that "the right to vote in a state election,

---

[1] In *Bonner v. City of Prichard*, 661 F.2d 1206 (11th Cir. 1981), the Eleventh Circuit adopted all Fifth Circuit decisions issued before October 1, 1981, as binding precedent.

in itself, is not a right secured by the Constitution or by federal law. Thus, even an improper denial of the right to vote for a candidate for a state office achieved by state action 'is not a denial of a right of property or liberty secured by the due process clause.'" *Id.* at 612 (quoting *Snowden v. Hughes*, 321 U.S. 1, 7 (1944)). And in *League of Women Voters of Ohio v. Brunner*, 548 F.3d 463, 479 (6th Cir. 2008), the Sixth Circuit held that even when an election system "impinges on the fundamental right to vote," it does not "implicate procedural due process" because voting is not a liberty interest protected by the due process clause. The district court here conducted no analysis on the question of whether the voters' asserted interest in this case was sufficient to trigger due process protection. Its failure to answer that question provides an independent basis to reject its analysis.

Ultimately, however, to rule on the present motion we need not decide whether the voters' right to vote by absentee ballot is a constitutionally protected liberty interest that triggers procedural due process protection. This is because, even if Plaintiffs are being deprived of that interest, they are being deprived of it by *legislative* action, not by *adjudicative* action. As we said in *Jones v. Governor of Florida*, "the Supreme Court has long distinguished between legislative and adjudicative action" when deciding "what the Due Process Clause requires." 2020 WL 5493770, at *20 (11th Cir. Sep. 11, 2020) (citing *Bi-Metallic Inv. Co. v. State Bd. of Equalization*, 239 U.S. 441, 445–46 (1915)). When a state deprives persons

21

of liberty or property through *legislative* action—an action passed by the legislative process that applies "to more than a few people"—then "the affected persons are not entitled to *any* process beyond that provided by the legislative process." *Id.* (emphasis in original) (quoting *Bi-Metallic*, 239 U.S. at 445); *see also Bi-Metallic*, 239 U.S. at 445 ("General statutes within the state power are passed that affect the person or property of individuals, sometimes to the point of ruin, without giving them a chance to be heard. Their rights are protected in the only way that they can be in a complex society, by their power, immediate or remote, over those who make the rule."). On the other hand, when a state deprives persons of a liberty interest through an *adjudicative* action—an action that concerns only a "relatively small number of persons" who are "exceptionally affected, in each case upon individual grounds"—then the affected individuals may be entitled to additional process above and beyond that provided by the legislative process. *Bi-Metallic*, 239 U.S. at 446. Only in the latter situation do courts apply the framework of *Mathews v. Eldridge*, 424 U.S. 319 (1976).

We have had occasion to apply this rule in various circumstances. In *75 Acres, LLC v. Miami-Dade County*, 338 F.3d 1288, 1290 (11th Cir. 2003), for example, we stated that the Due Process Clause had no applicability to a challenge to a county ordinance that required the County Manager to impose a building moratorium on certain parcels of real property without any pre-deprivation notice or hearing. The

22

moratorium, we explained, was a legislative action. *See id.* at 1296. And we stated, in *Jones*, that a group of felons challenging a voting rights restoration scheme had no rights to procedural due process because they lost their right to vote due to a provision of the Florida Constitution. *See Jones*, 2020 WL 5493770, at *20. That constitutional directive, we explained, was a legislative action. *See id.*

The application of this doctrine to the present case is manifest. Because even if Plaintiffs are being deprived of a constitutionally protected liberty interest, they are being deprived of that interest by *legislative* action. Georgia's Receipt Deadline is a law of general applicability which affects all Georgians equally. It was passed by Georgia's legislature performing a legislative function. No individualized determination is required (or provided) before a late-arriving ballot is rejected under the law. And no individualized determination is due. The "process" that Georgia's voters are entitled to before their late-arriving ballots are rejected is the process that inured during the enactment of the law itself. Procedural due process, then, has nothing to do with this case.

### III.

For these reasons, I agree with Judge Grant that the State is entitled to a stay pending appeal. By pointing out how the district court has misapplied the law, the State has more than carried its burden on the first and foremost factor required for a stay. The State's "case is strongest where it most matters, namely, the likelihood of

success on the merits." *Al Otro Lado v. Wolf*, 952 F.3d 999, 1022 (9th Cir. 2020) (Bress, J., dissenting). While it is true, as Judge Wilson notes in his dissent, that our review at this procedural juncture is narrow, our review must remain ever mindful that "the grant of a stay pending appeal is preventive or protective in that it seeks to maintain the status quo pending a final determination on the merits of the suit." *Ruiz v. Estelle*, 650 F.2d 555, 565 (5th Cir. 1981). Granting a stay here furthers that ideal by ensuring that Georgia's duly enacted election laws remain in place before a merits panel of this Court can rule on the propriety of the injunctive relief issued below.

WILSON, Circuit Judge, dissenting:

We review a district court's order entering a preliminary injunction for an abuse of discretion. *BellSouth Telecomms., Inc. v. MCIMetro Access Transmission Servs. LLC*, 425 F.3d 964, 968 (11th Cir. 2005). That is, we may only reverse and grant a stay of that injunction if "the district court applie[d] an incorrect legal standard, or applie[d] improper procedures, or relie[d] on clearly erroneous factfinding, or if it reache[d] a conclusion that is clearly unreasonable or incorrect." *Schiavo ex rel. Schindler v. Schiavo*, 403 F.3d 1223, 1226 (11th Cir. 2005). Our review is "very narrow" and "deferential." *BellSouth*, 425 F.3d at 968 (citations omitted). We have said that the district court "is in a far better position . . . to evaluate [the] evidence." *Cummulus Media, Inc. v. Clear Channel Commc'ns, Inc.*, 304 F.3d 1167, 1171 (11th Cir. 2002).[1]

The majority's review is not "narrow," nor is it "deferential." The district court did not act unreasonably when it directed the State to accept and count valid absentee ballots that are postmarked by and received within three days of Election

---

[1] We explain the purpose for this standard of review in *Cummulus Media*, stating:

> The expedited nature of preliminary injunction proceedings often creates not only limits on the evidence available but also pressure to make difficult judgments without the luxury of abundant time for reflection. Those judgments, about the viability of a plaintiff's claims and the balancing of equities and the public interest, are the district court's to make and we will not set them aside unless the district court has abused its discretion in making them.

*Cummulus Media*, 304 F.3d at 1171.

Day.  The district court applied the correct legal standards, made no clearly erroneous factfinding, and its conclusions are not unreasonable nor are they incorrect.  Given our standard of review, I would deny the State's request to stay the district court's injunction.

I.

To grant a preliminary injunction, the court must consider if the moving party demonstrated that: (1) there is a substantial likelihood of success on the merits; (2) it will suffer irreparable injury if relief is not granted; (3) the threatened injury outweighs any harm to other parties; and (4) the requested relief is in the public's interest.  *KH Outdoor, LLC v. City of Trussville*, 458 F.3d 1261, 1268 (11th Cir. 2006).

I cannot conclude on this record that the district court misapplied the *Anderson-Burdick* framework.[2]  The district court methodically followed the framework set forth in *Anderson* and *Burdick* and offered adequate support for its factual findings and legal conclusions.

**A. Likelihood of Success on the Merits**

The district court properly analyzed the plaintiffs' likelihood of success in their challenge to the absentee ballot deadline, O.C.G.A. § 21-2-386(a)(1)(F),

---

[2] When faced with the constitutionality of an election law, we apply the framework set out in *Anderson v. Celebrezze*, 460 U.S. 780 (1983), and later redefined in *Burdick v. Takushi*, 504 U.S. 428 (1992).

using the *Anderson-Burdick* framework.[3]  As the majority explains, this is a

balancing test.  Initially, the court considers the magnitude of the burden.  Then, it

weighs that burden against the state interests.  *Timmons v. Twin Cities Area New

Party*, 520 U.S. 351, 358 (1997).  If the law imposes a severe burden on the

plaintiff, then it "must be narrowly tailored and advance a compelling state

interest."  *Id.* at 351.   If the burden is not severe, a state must show that its asserted

interests are "'sufficiently weighty to justify the limitation' on the party's rights."

*Id.* at 352.

    i.      *Severity of the Burden*

In its thorough seventy-page order, the district court provided more than

"light analysis."  It did not "assume" that the burden imposed by the ballot

deadline was severe, and it analyzed the relevant facts and evidence proffered by

the parties.  The district court considered that COVID-19 has affected millions of

people in the United States, and Georgia is a "hotspot" for the virus.  *New Ga.

Project v. Raffensperger*, No. 20-cv-01986-ELR, 2020 WL 5200930, at *4 (N.D.

---

[3] The majority repeatedly refers to the ballot deadline as "decades-old" and "long-standing." There is no doubt that this deadline has long been the law in Georgia.  There is also no doubt that this law's lifespan is irrelevant.  The plaintiffs challenge O.C.G.A. § 21-3-386(a)(1)(F) as applied.  That is, the plaintiffs argue that, in light of a pandemic, a public health state of emergency, and the upcoming November election, the ballot deadline impermissibly burdens their fundamental right to vote.  Given that this is an as applied challenge, the history of the law is irrelevant.

Ga. Aug. 31, 2020).[4]  The pandemic is "ongoing," and creates legitimate concerns

about the safety of voting.  *Id.*[5]  Georgia recognized this issue by adjusting certain

aspects of the voting process, as well as encouraging absentee voting.

Unsurprisingly, a record number of people voted absentee in the June 2020

primary, and even more are projected to vote absentee in November.  The district

court found that the already "well-documented strains on Georgia's election

administration infrastructure," and the experiences of some of the individual

plaintiffs were important in finding that voters were being disenfranchised through

no fault of their own.  *Id.*  It also noted that over 7,200 voters had their ballots

rejected as late in the June 2020 primary, and that number would undoubtedly be

larger in November.

The district court's analysis is thorough and complete.  I disagree with the

majority's claim that the district court erred in finding that the burden on the right

to vote was severe.  The district court did not "ignore" the fact that the percentage

---

[4] In fact, the United States District Court for the Northern District of Georgia recently decided to suspend jury trials until January.  The court said this was necessary considering that Georgia has "one of the highest positivity rates in the nation" for COVID-19 cases.  *See* Robin McDonald, *Northern District's Chief Judge Extends Jury Trial Suspensions*, LAW.COM (Sept. 29, 2020), https://www.law.com/dailyreportonline/2020/09/29/northern-districts-chief-judge-extends-jury-trial-suspensions/.

[5] The confirmed cases of COVID-19 in the United States have increased by over one million—from 5.7 million documented cases to over 7.1 million documented cases—from the time the district court issued its opinion only a month ago.  *Cases in the U.S.*, CTRS. FOR DISEASE CONTROL, https://covid.cdc.gov/covid-data-tracker/#cases_casesinlast7days (last visited Oct. 1, 2020).

of absentee ballots rejected in the June 2020 primary election was lower than in 2018. The rate of affected voters is not always a key consideration. *See Anderson*, 460 U.S. at 784 (1983) (finding a law violated people's voting and associational rights even though it affected only a small percentage of voters). Even so, the district court explicitly noted the number of absentee ballots accepted and rejected in both 2018 and June 2020, demonstrating that it did not ignore evidence in determining the severity of the burden. Contrary to the majority's contention, the district court also considered the measures that Georgia has taken to address absentee voting. It offered a detailed description of Georgia voting procedures and it relied on these measures to support its decision to deny most of the plaintiffs' requests for relief.

ii.    *Balance of State's Interests*

The district court sufficiently addressed Georgia's interest under the *Anderson-Burdick* framework. Because it found that the burden was severe, the law had to be "narrowly tailored and advance a compelling state interest." *Timmons*, 520 U.S. at 358. Georgia articulated legitimate interests in maintaining the ballot deadline—namely in conducting an efficient election, maintaining order, quickly certifying results, and preventing voter fraud. While the district court acknowledged the State's interests as valid, the means the State used to achieve

these interests—the ballot deadline—were "not justified by the severe burden faced by certain voters." *New Ga. Project*, 2020 WL 5200930, at *25.

The district court closely analyzed the gravity of the pandemic, the facts of this case, and previous caselaw to balance the burdens on the plaintiffs and defendants, respectively. It explained that absentee ballots must be postmarked by Election Day. Then, it carefully crafted the three-day extension, and thoroughly explained why it was more appropriate than the proposed five-day extension. The district court's conclusions, and the remedy it fashioned, are reasonable: it imposes a small burden on the State in order to avoid a more substantial burden on an individual's right to vote. I disagree with the majority's claim that the district court abused its discretion in applying the wrong legal standard. The district court applied the correct legal standard—the *Anderson-Burdick* framework—a framework that is flexible and fact dependent. *See Crawford v. Marion Cnty. Election Bd.*, 553 U.S. 181, 191 (2008) (recognizing that there is "no litmus test for measuring the severity of a burden that a state law imposes on . . . an individual voter"); *Gill v. Scholz*, 962 F.3d 360, 365 (7th Cir. 2020) (explaining that a "fact-intensive analysis" is required under the *Anderson-Burdick* framework).

## B. The Remaining Three Factors

The district court found that the remaining three factors—irreparable harm, the other party's harm, and the public interest—weigh in favor of the plaintiffs.

30

It asserted that the State will not be irreparably harmed by this injunction. While acknowledging there are some administrative burdens in amending the ballot deadline, the district court found that these burdens are low. The State already uses an identical deadline for some voters under O.C.G.A. § 21-2-386(a)(1)(G), so adopting this standard for all absentee voters is not unreasonable. On the other hand, the district court explained that a severe burden on the right to vote is generally irreparable because once a deprivation occurs it cannot be redressed. Lastly, the court found that the injunction is in the public interest, as the public has an interest in ensuring votes are counted and that the right to vote is protected.

I would look to the district court's order with the deference that the law requires. The district court's order—that the State should accept absentee ballots that are postmarked by but received within the three days of Election Day—is not unreasonable. Because the majority does not give the district court the deference our precedent requires, I dissent. I would deny the State's motion for a stay of the district court's injunction order.

31